EUGENE STORY *v.* THE STATE.

1. CRIMINAL PROCEDURE. *Murder. Continuance. Case in judgment.*
    A homicide occurred Nov. 14, on account of which defendant and another
    were jointly indicted for murder, Dec. 4, and the case was set for trial
    on the 6th.   The killing occurred twenty miles from the county site, and
    defendants, having been in jail, asked further time to confer with wit-
    nesses and for permission to prepare a formal application for continuance
    before answering as to a severance or as to a special venire.   This was
    refused.   A severance was had, and a special venire, was ordered.   De-
    fendant then made an application for continuance on account of the ab-
    sence of several witnesses, all of whom afterwards appeared except one,
    who had not been summoned, and who had permanently removed from the
    state.   The continuance was refused, and defendant was tried December
    11, and convicted.   *Held,* that the court did not err in these rulings.

2. SAME. *Murder trial. Jury-box exhausted. Special venire.*
    A special venire drawn from the jury-box being quashed, and the names in
    the box being exhausted, defendant moved that the clerk be directed to
    deposit therein the names appearing on the jury-list for that year, and
    that a venire be drawn therefrom.   This was refused, and the sheriff was
    ordered to summon a special venire.   There was no evidence that the
    officers had failed to perform their duties in making up the jury-box.
    *Held,* no error ; in the absence of evidence to the contrary, it is to be
    assumed that the box was legally exhausted.

3. SAME. *Selecting jurors. Voir dire examination.*
    The court may examine jurors on the *voir dire,* inviting counsel to suggest
    questions but not permitting them directly to interrogate,—after being
    satisfied as to competency, allowing counsel to question, with a view to
    peremptory challenge but not otherwise.   This practice violates no right
    of the accused, prevents unnecessary consumption of time, and assures
    full and impartial examination of jurors.

4. CRIMINAL LAW. *Homicide. Motive; proof of by state.*
    While a malicious killing implies an unlawful motive and the state need
    not on the trial of the slayer show the existence of such a motive, yet
    this may be done as explaining the character of the killing, and to
    strengthen the probability that the accused was impelled by such motive
    rather than that he was actuated by another cause.

5. SAME. *Motive to kill. Malice of another. Evidence.*
    On a murder trial, where the killing by defendant is undisputed—only the
    .   circumstances of it being in controversy—and the evidence shows that
    the defendant was a comparative stranger to the deceased, having no ill-

will or personal motive to harm him, the state may show as furnishing a motive, and in opposition to the plea of self-defense, that hatred of the deceased or the desire to be rid of him resided with another, and that this was the cause of the killing. '

6. SAME. *Conspiracy. Malice of another. Defendant's motive. Evidence.*

In such case, without establishing a previous conspiracy, evidence of the malice of such other person and his letters evincing ill-will and a desire to drive deceased from his plantation, though long antedating defendant's connection with the affair, are admissible, there being evidence that the defendant, by his own declarations prior to the homicide, had connected the malice of such person and his desire to drive the deceased from the place with the killing, as constituting a motive for the act.

7. CRIMINAL PROCEDURE. *Evidence. Immaterial error.*

On a trial for murder the state offered evidence tending to show that the killing by defendant was instigated by Jones, or that Jones' desire to get rid of deceased induced a motive for the killing. After the killing, a witness had promised defendant to send Jones a telegram, asking him to become bail. This witness, being asked about such telegram, defendant objected on the ground (1) that the telegram was incompetent against him, (2) that the evidence was secondary. The court ruled that the witness could not be required to answer until the telegram was shown him. Without waiting, he answered, giving the contents of a telegram sent by him to Jones as follows: "Eugene killed Barney, justifiable. Will be home on to-morrow's train." *Held*, that, since no objection was made to evidence of the fact that the telegram was sent, there is nothing in its contents tending to the injury of defendant.

FROM the circuit court of Holmes county.

HON. C. H. CAMPBELL, Judge.

On the 14th of November, 1889, Barney Kleinfelder was killed in Holmes county, Mississippi. On the 4th day of December following, the appellant, Eugene Story, and one M. Jones, Jr., were indicted in the court below for his murder. The defendants had been imprisoned on said charge since November 16th. When the indictment was presented they were brought immediately into court, when they asked that time be granted themselves and counsel to prepare their defense. The court ordered the case set for the following Friday, December 6, at 9 o'clock, when the state and defendants should announce whether they were ready for trial. The defendants objected to this, and asked for longer time, in order that

they might ascertain what witnesses they would need and prepare for the trial, it being then shown that they had been in jail since two days after the killing. The application was overruled, and defendants excepted.

On Friday the defendants were again brought into court, when the district-attorney announced ready for trial. The witnesses for defendants were then called, a number of them being absent. Defendants announced that they were not ready for trial on account of the absence of their witnesses. The court then demanded of defendants to know whether they would ask for a severance. Through their counsel, they moved the court to be permitted to make a written application for a continuance of the cause before they took any action in respect to a severance. This was refused. The court stated, however, that defendants could have attachments for all the witnesses who had been summoned, and if any legal cause for continuance existed, it could be shown when the case was called for trial, which would be on a subsequent day of the term. To this action of the court the defendants excepted. They then applied for a severance, which was granted, and the district-attorney elected to try the defendant Story first, and his case was taken up. The court then asked if a special *venire* was desired, and the district-attorney answered no on behalf of the state. The defendant Story then asked that he be not required to answer whether he desired a special *venire* until he could make application for a continuance, and asked that time be granted him to make such application. This the court refused, and the defendant excepted.

The court then required the accused to answer whether he desired a special *venire,* when he responded that he did, excepting to the action of the court in compelling him to make the election at that time. The court then ordered that there be drawn from the jury-box the names of thirty persons to constitute a special *venire,* and the names were drawn accordingly. The case against Jones was then called, the same proceedings as to the application for continuance and as to severance were had as in Story's case, and the court ordered that the names of forty persons should be drawn to constitute a special *venire* in the case against Jones. The sheriff then

proceeded to draw the names of forty persons from the jury-box, and when this was done the names in the box were exhausted, and this was announced to the court, whereupon the defendant, Story, moved to quash said special *venire* as drawn in his case, and the motion was sustained.   The court then ordered the sheriff to summon in his case a *venire* of thirty men.   To this the defendant, Story, objected, and moved the court to direct the clerk to now comply with the law by placing in the jury-box the names of persons contained in the jury list returned by the clerk of the board of supervisors of said county for that year.   The clerk of the court then produced this list containing 254 names, it being the list from which the jury-box had been originally made up.   The court stated that evidently the law had not been complied with in making up said jury-box, or it would not have been so soon exhausted, but refused to allow the names on the list to be placed in the box, and to direct the special *venire* to be drawn therefrom as asked by the defendant, and the sheriff was ordered to summon the special *venire*, to all of which the defendant, Story, excepted.

The court then set appellant's case for trial on Wednesday, December 11, 1889, at 10 o'clock A.M.   Defendant's counsel asked the court to allow them to apply for a continuance, or to set the case for a later day of the term, in order that they might have an opportunity to confer with the witnesses, many of whom were then unknown to counsel, the scene of the killing being about twenty miles from the county site, but the court refused to do this, and the defendant excepted.

On December 11, the day fixed for the trial, the case being called, the state announced ready, and the defendant's witnesses being called, the following failed to answer : Daniel McBride, Harry Gillam, Charles Olson, S. A. Jackson, D. L. Smythe, Jr., and Peter Hall.   Of these, Jackson and Smythe were present during a part of the trial, but were not introduced.   The defendant stated that he was not ready for trial, and asked time to prepare his application in writing, which the court granted, and an affidavit was made setting out the facts expected to be proved by the witnesses who had failed to answer.   While the application was being

read, the witnesses, Olson and Hall, appeared in court, and afterwards Gillam appeared and testified.

The state then introduced witnesses, and showed that the witness, Daniel McBride, named in the application for a continuance, had sold his property in the county and removed to the state of Arkansas. J. E. Gwin, counsel for defendant, then stated that it was not known to him that this witness had removed or intended to remove until he had heard it in the trial of another case three days before. The other counsel for defendant stated that they had never heard it at all until that time. Counsel further stated that McBride was an intelligent man and an important witness, and they asked the court to allow them, in view of all the facts in the case, an opportunity to secure his presence, which they were satisfied could be done if the case should be continued. The affidavit for continuance showed that the absent witness, McBride, had been a justice of the peace and as such acted as coroner in holding the inquest at the time of the killing of Kleinfelder, and it was stated that he would testify as to what Austin Williams, the main witness for the state, had sworn at such inquest, the object of this being to contradict Williams. It was shown that the testimony of the witness, Williams, at the inquest had been taken down in writing by the said McBride in the presence of the coroner's jury and signed by the witness, and was then in court. The court refused to grant the continuance and the defendant excepted. The case then proceeded to trial, and .ie defendant was convicted and sentenced to be hanged.

The defendant excepted to the action of the court in refusing to give the following instruction :—

" 15. The jury are further instructed by the court that in deciding as to the guilt or innocence of the defendant, they will exclude from their consideration any letter written by Dr. Jones to Millsaps or other persons, or of any conduct, act or declaration of Dr. M. Jones towards deceased or other person, unless the evidence in the case makes it certain, to the exclusion of every reasonable doubt, that the defendant was either connected with or authorized the same."

Among others, the court gave the following instruction for de-

fendant : " 5. The court instructs the jury that defendant should not be held responsible for, nor should the jury consider, the acts or demonstrations of Dr. M. Jones, unless they believe from the evidence on the subject beyond all reasonable doubt that there was an agreement, understanding, or conspiracy between Dr. M. Jones and defendant, that defendant should kill deceased, and that the question as to whether there was such an agreement should be determined by the jury from the evidence on that subject; and if there is a reasonable doubt in the minds of the jury as to whether there was such an agreement, understanding or conspiracy, then the prisoner should have the benefit of such doubt, and the evidence on the subject of Dr. Jones' threats and declarations should not be considered by the jury in determining the guilt or innocence of the accused."

The opinion of the court contains a further statement of the case. Defendant was convicted and sentenced to be hanged. Motion for new trial overruled, and defendant appealed.

*Haden & Dodd* and *J. E. Gwin*, for appellant,

Filed an elaborate printed argument making the following points :—

1. The case in the preliminary steps was shoved through without giving defendant and his counsel that time for preparation which the gravity of the charge demanded. It was error to refuse defendant his manifest right of making an application for a continuance. He had been in jail since two days after the killing, and had just been indicted. The case was set for trial against his protest. Under the law he could not apply for a continuance after the special venire was demanded. By the action of the court he was forced to ask for a special venire before he could apply for a continuance. Besides prejudicing the cause of the defendant by repeated unfavorable rulings, the court deprived him of opportunity to see his witnesses, who lived at a distance from the court, to investigate the facts and make preparation for the trial, which involved his life. Within a few hours after the indictment was found he was compelled to go to trial and take the most important

step in the case ; that is, either to ask for a continuance or waive a special venire and go on with the trial ; or to ask a special venire in order to get the time which the court had refused to grant him.

The record shows a number of errors in the preliminary steps of this case. Though it may not be regarded that any of these are sufficient of themselves to cause a reversal, yet continued unfavorable rulings by the court are often very prejudicial in a case of this kind. Jurors and others observe closely the action of the court, which by every word and act has an immense influence in the trial. Defendant being disallowed the ordinary right of making an application for a continuance, and the case being pushed through, it was natural that all persons present should think that the court believed there was something unusual in the case. If the defendant had been allowed the ordinary and usual rights accorded a prisoner on trial for his life, how different would have been the attitude of the case, and what an influence it would have exercised upon the trial !

2. The defendant in this case being a stranger, it was of the greatest importance to him to be tried by a jury properly selected and perfectly unbiased. Under the rule adopted by the court in the examination of jurors, each juror was made the judge of his own competency ; not by stating facts, but by expressing an opinion. The office of counsel is to ask questions in order to develop the facts, but according to the special rule of the court this was refused. Counsel could only ask questions with a view to peremptory challenges. Why not dismiss the counsel for defendant at once ? It is not the law that every one should judge of his own competency to serve on a jury in a capital case. A conceited fool thinks he is capable of doing justice, notwithstanding his expressed opinion, while the conscientious man doubts his capacity to do so. The villain who procures himself to be summoned is, of course, prepared to say that he knows he can fairly try the case notwithstanding his opinion. The rule applied in this case operates to exclude good men from the jury. The accused is guaranteed a fair and impartial trial, but he does not secure it with jurors in the box who have formed and expressed an opinion of his case. Nor can it be said that a prisoner is heard by counsel when they are not permitted to

ask the most important questions in order to prove the interest, the bias, or the prejudices of the men who are to pass upon the questions involving his life.

3. The letters, declarations and threats of Dr. Jones, in relation to the deceased, long anterior to any connection between Jones and Story, were improperly admitted in evidence. This evidence could only prejudice the defendant and have the tendency to influence the minds of the jury and connect his act with the motives of Dr. Jones. It was not shown that he even knew anything about the letters and conversations or the bad feeling that existed in the mind of Jones. It is doubtful if any unbiased jury could have been assembled who would have convicted the defendant upon the contradictory testimony of the self-contradicted witness, Austin Williams, but for the introduction of this illegal evidence. It was proper for the state to show a motive outside of the unreliable testimony of this witness, but this should have been by legal evidence of some act done by Story or of which he was cognizant.

Admit, for argument sake, that Dr. Jones was a conspirator with Story, what declarations of his were admissible in evidence? The connection of the individuals being shown, every act and declaration of each member of the conspiracy, in pursuance of the original plan and with reference to the common object, is the act and declaration of all. Care must be taken that the acts and declarations thus proved, are those only which were made or done *pending the criminal enterprise and in pursuance of its object.* 1 Greenleaf's Ev. § 111. To the same effect, see 1 Phillips on Ev. p. 94. What one party may have been heard to say at some other time cannot be admitted as evidence to affect others on trial for the offense. 2 Russell on Crimes, 697; Roscoe's Crim. Ev. §§ 417, 418; 2 Starkie's Ev. 235.

The authorities on this subject are forcibly considered by this court in the case of *Gillum* v. *State*, 62 Miss. 552. See also Carson on Crim. Con. and Agreements, p. 128; 10 Norris (Pa.), 148; 7 Iredell (N. C.), 329; 13 Ib. 63; 75 N. C. 210.

Considering the 15th instruction, which was refused, with reference to the above authorities, the court committed a manifest error

greatly prejudicial to the defendant, and for which the judgment should be reversed. It should be borne in mind constantly in determining the influence which this evidence may have had on the minds of the jury that no motive was shown for the killing by Story, except that testified to by the negro Austin Williams. His testimony was wholly unreliable on account of his contradictions, and the illegal evidence was brought in to show that the motive of Dr. Jones was shared by Story, and this without showing any connection whatever between them at the time of such declarations, threats, etc. Without the motives of Jones being lugged in to prejudice the minds of the jury, quite different issues would have been presented. Who can say what the jury would have decided had this illegal evidence been excluded? Is it a fair trial for the defendant when the jury is listening to declarations of malice, letters and threats of which the defendant never heard until testified about at the trial?

4. It was error to admit the evidence in respect to the telegram sent by M. Jones to his father the day after the killing. Not only was the telegram itself inadmissible for reasons above discussed, but its contents could not be proved without laying the foundation by showing its loss or destruction. This evidence was intended to impress the jury with the idea that there was collusion between Dr. Jones and Story. At what time can we imagine that the defendant would be exempt from the effect of declarations, letters or telegrams of others made or sent while he was under arrest? There is no case that we have ever seen or heard of holding that the declaration or act of a co-conspirator after the object of the conspiracy is accomplished can be given in evidence. Counsel contended that the conspiracy was not finished, but certainly it was so far as the crime for which the defendant was charged.

5. (The counsel here discussed at length the facts of the case, contending that the jury had found contrary to the law and evidence.)

*T. M. Miller*, attorney-general, for the state,

Filed a brief discussing the facts of the case, and in addition thereto making the following points :—

1. Much clamor is raised because testimony was admitted to prove the feelings of Dr. Jones towards the deceased, and his efforts to induce others to drive him from the place. The abstract rule contended for by counsel might be admitted, and still there would be no error here. This was the trial of the actor in the tragedy, and it was sought by the evidence objected to, not alone to prove a conspiracy with another, but to corroborate a witness in respect to what defendant himself has said, and to prove a motive. The testimony was all admissible to disprove the pretense that Story was hired and sent to the plantation on a proper mission. The counsel fail utterly to distinguish between the case where it is sought . to hold one criminally responsible for the act of another under the law of conspiracy, and where it is sought to prove a motive in the murderer by showing that he was acting in the real or supposed interest of another. Motive would be the very foundation of a conspiracy, but the limitations are not so narrow as appellant claims, as is shown by the brief of associate counsel and the authority cited. *Lamar* v. *State*, 63 Miss. 265. The whole argument of appellant's counsel as to this is founded on a misapprehension of the case.

2. There is absolutely nothing in the other point made in argument on the question of a continuance, examination of jurors, etc. Nor in respect to the telegram sent by young Jones to his father. The contents of the telegram imparted nothing more than what he swore to on the trial, that the killing was justifiable.

It is not pretended that other than a fair and impartial jury was selected to try the case, despite the rule laid down by the court for the examination of jurors. Our statutes on the subject of impanneling juries are all declared to be directory.

*Hooker & Wilson*, on the same side.

The evidence objected to in the court below was admissible. It is competent to show conspiracy to murder among others than the defendant, though its existence be unknown to him, if he afterwards is connected with it by competent evidence. *Lamar* v. *State*, 63 Miss. 265.

The defendant in this case, by the evidence of Austin Williams, is connected directly with the purpose of Jones to get the deceased

off the plantation.   The evidence of guilt is overwhelming.   From defendant's own testimony, it is plain that the circumstances and the cause of the killing did not exist as stated by him.

Argued orally by *J. E. Gwin* and *S. L. Dodd,* for appellant, and by *G. A. Wilson* and *T. M. Miller,* for the state.

Cooper, J., delivered the opinion of the court.

We find no error in the rulings of the court below in refusing to permit the appellant to make an application for a continuance when the venire was ordered, or in directing the writ of *venire facias* to the sheriff, when, upon the motion of appellant, the venire drawn from the jury-box was quashed, or in overruling the application for a continuance made by appellant on the day fixed for his trial, or in the examination of the jurors upon their *voir dire* and impanneling the jury by which he was tried and convicted.

When the defendant first asked the court to permit him to prepare his application for a continuance, it was properly refused, because it could not then be known whether his witnesses would or would not be present at the time fixed or about to be fixed for trial, and if they should be in attendance the ground of the application would fail, as it did fail; for on the day of trial every witness desired by the defendant appeared in court save one on whom process had not been served, and who was shown to have permanently removed to another state.

The venire drawn from the jury-box was, upon the motion of the defendant, quashed, and it then appeared that the jury-box had been exhausted.   The defendant then moved the court to direct the clerk to make up a jury-box by depositing therein the names appearing on the jury list for the year.   The court properly overruled this motion, for, in the absence of any evidence to the contrary (and none was offered by the defendant), it must be assumed that the officers discharged the duties imposed on them by law, and that the jury-box had been legally exhausted.   In this condition of affairs nothing remained for the court except to secure the venire in the method adopted.

We find nothing in the rule announced by the presiding judge, for the examination of jurors, prejudicial to the defendant. That rule was that the judge would undertake the examination of jurors upon their *voir dire* touching their competency, permitting and inviting counsel to suggest any questions they desired to be asked but not permitting them to directly interrogate the jurors upon the subject of their competency, and after each juror had been found competent by the judge, he was then to be examined by counsel directly, with a view to peremptory challenge, but for no other purpose. The rule thus announced by the presiding judge is to be commended rather than reprehended, for its operation is to prevent an unnecessary consumption of the time of the court, assures full and impartial examination of jurors, and violates no right of one charged with crime. Under its operation an impartial jury, against no member of which is objection taken, was secured to the accused, without his having exhausted the peremptory challenges allowed him by law.

On the trial of the cause it appeared that Barney Kleinfelder, the deceased, by an arrangement between himself and Dr. Muntford Jones had erected a saw-mill on the plantation of the latter, which was operated by Kleinfelder who received three-fourths of the lumber cut from the timber on Jones' place, Jones receiving the remaining fourth, and that for some months before the homicide there had been a disagreement between Jones and Kleinfelder in reference to their business.

Austin Williams, the principal witness for the state, and the only eye-witness to the killing, gives the following history of what preceded, and the circumstances attending the killing : On or about the first of November, 1889, the defendant, Story, and Muntford Jones, Jr., a son of the owner of the plantation, appeared on the place, each armed with a new Winchester rifle, and a pistol. They took their meals at the house of this witness (a negro), and, there being no vacant house on the place, slept at night in his cotton house. Story had a pair of saddle-bags, the contents of which were one undershirt, one pair of drawers and some Winchester cartridges. Story and Jones arrived at the house of witness in the

afternoon, and Story some time thereafter suggested that they should
go to the mill. Jones replied that he was too tired and preferred to
wait until morning. The next day they met at the mill, and, after
their return, witness heard a conversation between them in which
Story said, "They are fine fellows." Jones replied, "Yes, but I
want a settlement." • Story then said, "If you cannot get à settle-
ment, let us do what we. came here to do." Jones replied, "No :
we came from Kosciusko, through Durant, Lexington and Tchula
with our guns, and it will not do to have trouble so soon." Story
then suggested, "We will get him off to himself some day and
lose him. I came here to get those fellows off the place, and will
do it if I have to kill every one of them."

On another occasion at the house of the witness, Story, Jones
and Kleinfelder were all present as were several other persons. It
was night, and when no one was looking at them, Story and Jones
"winked and batted their eyes at each other and at witness, and
made signs to him," which he interpreted as meaning that he
should get the others out of the house, so they might kill Klein-
felder. Story then went and called the two negroes who had his pis-
tols and got the pistols. The witness then took Jones aside and told
him not to kill Kleinfelder in or about his (witness') house, as it would
involve witness. Jones then had a whispering conversation with Story
and returned and told witness "it was all right." Story got up
and stood with his back to the fire, and witness then called him
aside and said to him that he did not want any murder at his house.
When Kleinfelder was about to leave the house Story said to him,
"Go out this way," directing him to the door which led through
the cotton field. Kleinfelder said, "No, he would go the other
way." Then Story insisted upon his going through the field.
Story and Kleinfelder then went out together and walked off some
distance in the dark. Witness then told Jones not to let any
murder be done, and he replied that there would not be, and called
Story, who returned, and he and Jones stood out-doors and talked
awhile, but witness did not hear the conversation.

The circumstances of the homicide, which was on Nov. 14th, as
given in the language of this witness are as follows :—

"On the day of the killing of Kleinfelder I went across the bayou to John Parrot's to weigh some cotton and found no one there. I came on back late in the evening and passed by where Story was looking for a squirrel; stopped and asked him what he was doing. He said he was after a squirrel and asked me to shake a bush so as to turn it for him. I did so, and saw a hole in the tree that a squirrel could go into and told Story of it, and that I did not have time to fool there. I then left him, and came up the road and met Kleinfelder about a hundred yards from where Story was. I stopped and told him I wanted to get some lumber, and gave him the size of the house and asked him to make out the bill. While we were talking Story came up, holding his gun through his arms on inside of his elbows behind and across his back, and stood near Kleinfelder, with the muzzle of the gun pointing towards his right side. Story threw or moved himself by motion of his body to and fro and changed his right hand to the trigger and lock of the gun; all at once the gun went off, Kleinfelder said, 'Oh, Christ,' and leaned forward; then Story handled his gun. Kleinfelder said 'Don't shoot me,' and threw his arms across his chest or front of his body; Story then threw the butt of his gun to his shoulder and fired another shot, and Kleinfelder fell to the ground; Story then shot him again. Story then told me to go up and feel in Kleinfelder's pocket and see if he had a knife; I refused to do it, and Story levelled his gun on me and said he had killed two men where he came from, that Dr. Jones would bond him and get him out of it, and told me if I did not do it he would shoot me. I then went up to Kleinfelder and felt in his pocket and felt the knife, but I told Mr. Story I did not find a knife. We then went up towards my house, and met Mr. Jones about thirty yards from the place of killing. Jones said, 'What is the matter?' Story said, 'I have killed Barney Kleinfelder down the road.' Jones asked if he was dead; Story replied, 'Yes, dead as hell.' Jones asked, 'Did you find a knife or any weapon on him?' Story replied, 'No.' Jones said, 'He had a knife, I saw it about a half hour ago.' We all three then went to the body, Jones took Kleinfelder's knife from his left hand pocket and opened and placed it by his side; he then

took Story's knife and cut Story's coat; Story said, 'Take care, fellow, don't cut my coat too much; this is all the coat I have.' Story and Jones then talked the matter over and agreed what we were all to swear to about the killing. Story told me that if I did not swear to what he had agreed on he would kill me wherever he found me, and that Dr. Jones would back him up in it; and if my evidence sent him to prison, he would kill me whenever he got out, it made no difference how long. What was agreed on I stuck to until I heard Story was in jail. I was afraid to do otherwise.

"We then went back to my house, Story then said to Jones, 'I have done what I agreed to and I want my pay.'

"Jones said, 'I will telegraph to my father and he will go on your bond.'

"At the time Kleinfelder was killed he had a bottle of coal oil in his right hand and a stick in his left, with a sack across the stick and a ham in each side of the sack. He appeared astonished at the first shot; not a thing indicated that Story intended to shoot. He had no knife in his hand at the time, and not an unkind word had been said. After the second shot he fell on his right side, and was shot the third time while in that position."

The witness also stated, that on one occasion Story said to Jones that they could kill Barney and Jake Kleinfelder, but it would be a pity to kill the young lad [a younger brother of deceased who was also at the mill], that when the others should be killed he would leave the place anyway; that on one occasion Jones and Story got up a wild hog hunt and invited Kleinfelder to go on it, who agreed to go but did not do so; that afterwards in a conversation between Jones and Story, they said Kleinfelder had saved his life by not going. The witness further said that he was the manager for Dr. Jones on his place, and that Story said to him that in any controversy between the landlord and outsiders the tenant should be on the side of the landlord.

This witness on cross-examination admitted that on the examination before the coroner's inquest he had testified that when Story came up to where witness and Kleinfelder were talking about the lumber, he requested Kleinfelder to keep an accurate account of all

lumber sawed by him on the partnership mill; that Kleinfelder inquired in an angry manner, "What in the hell have you got to do with it anyway?" That Story said, "It is a part of the business for which I was sent here;" that Kleinfelder then said, "I will kick hell out of you, and will settle this matter with you right now," and lunged at Story with his knife, cutting him on the breast of his coat, and that Story then shot and killed him. He also admitted that after his arrest and while in jail, he had made similar statements to several persons, but explained that this was because of his fear of Story.

The state proved by a brother of the deceased that a short time before the killing young Jones had attempted to have a settlement of the partnership affairs between his father and the deceased, but failed to agree, and that while the discussion between Jones and the deceased was in progress, Story sat near by with his rifle across his lap. It also proved by this witness that immediately after the killing he went to the body of his brother and found it lying on the back with the sack of hams under it, a bottle of coal oil clenched in the right hand, the right pocket partly turned out and the knife lying near the left side in the blood; that there were three wounds on the body made by balls from the rifle, one entering above the left hip, traversing the body and coming out on the right side of the neck, one entering in front and passing out at the back a little above the point of entrance, and the third entering beneath the left ear and cutting the hat band on the right side at its exit.

The state, over the objection of the defendant, was permitted to show in evidence the following facts: By the brother of the deceased, that there was a pending law-suit between Dr. Jones, the owner of the plantation, and the deceased. By the witness Austin Williams, that he had gone to Kosciusko several times during the year to see Dr. Jones, who was very bitter against Kleinfelder, and got witness to appear before the grand jury as a witness against him, whereby several indictments were secured against him, by reason of which Kleinfelder was unfriendly toward witness, which defendant knew, and he knew that witness wanted to get Kleinfelder off the place. By witness Neal, that in February preceding the homicide he had

a conversation with Dr. Jones in reference to the trouble between Dr. Jones and the deceased, in which conversation Jones said that " Kleinfelder had sent him (Jones) word that he was going to make catfish bait out of him, and he never talked to Kleinfelder without having his hand on his pistol ; that he was going to get rid of him, a blue-bellied son of a bitch, and would kill him if he were to make a motion against him." By witness Millsaps, that he was the manager of the store on the Marcella plantation of Mr. Richardson, which is about two and a half miles from Dr. Jones' place ; that in the spring preceding the homicide he had a conversation with Dr. Jones, in which he stated that he desired to get rid of deceased and would force him off his place. And by this witness it was proved that the following letter had been written to him by Jones, whose handwriting he recognized, which letter was also admitted in evidence, over the defendant's objection :—

"KOSCIUSKO, Miss., May 30, 1889.
" E. F. MILLSAPS :

"DEAR SIR—I hear that Kleinfelder is selling all my lumber to Gen. Miles, and to Marcella, too ; is it true? Please inform me by return mail how many Winchesters are on Marcella, and how many boys can I rely upon, and who are they? What became of those deer dogs that Mr. Alford had on Marcella?

"Your friend truly,       M. JONES."

Also, over like objection, the following letter written by Dr. Jones to the deceased :—

"KOSCIUSKO, Miss., June 6, 1889.
" B. P. KLEINFELDER :

"DEAR SIR—I wrote you two weeks ago for statement of lumber sawed at my mill up to date. I heard nothing from you. Again I ask you for the amount of lumber sawed at my mill, and notify you to saw no more, to shut my mill down from this day on. We saw no more on shares ; our agreement is at an end. A settlement is required, and you to remove from my plantation.

"M. JONES."

68 MISS.—40

Objection was made to one other piece of evidence, which will be hereafter noticed.

Objection was taken to all the evidence above noted on the ground that the declarations of Jones therein referred to were not made in the presence of the defendant; that they were remote in time and irrelevant in character; that if introduced by the state under the theory that a conspiracy was formed between the defendant and Jones for the murder of Kleinfelder, they were made long before any supposed conspiracy had been formed, and were not acts done or declarations made in the prosecution of the common purpose.

It is unnecessary to consider the evidence in the light in which it is supposed by appellant's counsel to have been introduced. There is another view, and the one we infer held by the court below, in which its competency, resting upon a totally different principle than that which applies where the act of one co-conspirator is sought to be used in evidence against another, is apparent.

The act of one co-conspirator is admissible against the other because, in contemplation of law, the act of each is the act of all. Its competency as evidence rests upon the same principle that underlies the relation of principal and agent in legitimate affairs, and is subject to the same limitations that are there applied. It is for the same reason that the act of an agent in civil affairs beyond the scope of his agency, and the act of a co-conspirator not done in the prosecution of the common purpose, is incompetent to bind, and therefore incompetent as evidence against the principal in the one case, or the conspirator on trial, in the other. That reason is, that the act is not that of the person against whom it is invoked, done through the hand of another, but is the independent, unrelated act of the person by whom it is done.

Where a conspiracy is formed to do an act, all are bound by the act of each in the prosecution of the common purpose, for the *object* of the conspiracy calls it into existence, and he who seeks to accomplish that object acts, not only for himself, but for all others who by joining with him aid, encourage and authorize the act he does. 4 Am. & Eng. Ency. of Law, § 621, note 5.

But a person actually committing a crime is none the less responsible for it whether he acts for himself alone or for himself and others.    Upon the trial of the actual perpetrator of an offense, it is not necessary for the state to show by direct evidence the motive which impelled him to commit it.

A malicious killing of itself implies some unlawful motive, and the state need not establish what that is by specific proof.    But it does not follow that because it need not, therefore it may not make such proof.    It cannot be said that the motive with which an act is done is irrelevant to explain its character or to strengthen the probability that the person shown to have committed it was impelled by such motive rather than some other.    Mr. Stephen in his admirable digest on the law of evidence thus formulates the rule : " Where there is a question whether any act was done by any person, the following facts are deemed to be relevant, that is to say, any fact which supplies a motive for such an act, or which constitutes preparation for it ; any subsequent conduct of such person apparently influenced by the doing of the act, and any act done in consequence of it or by the authority of that person."

In treating the subject under inquiry, Mr. Roscoe says : " But there are cases in which much greater latitude is permitted, and evidence is allowed to be given of the prisoner's conduct on other occasions where it has no other connection with the charge under inquiry than that it tends to throw light on what were his motives and intention in doing the act complained of.    This cannot be done merely with the view of inducing the jury to believe that because the prisoner has committed a crime on one occasion, he is likely to have committed a similar offense on another, but only by way of anticipation of an obvious defense."    1 Ros. Cr. Ev. 140.

In *Rex* v. *Clewes,* 4 C. & P. (19 Eng. Com. Law, 485) upon an indictment for murder of one Hemmings, it was opened that great enmity existed between Parker, the rector of a parish, and his parishioners, and that the prisoner had used expressions of enmity against the rector, and said that he would give £50 to have him shot ; that the rector was shot by Hemmings, and that the prisoner and others who had employed him, fearing that they should be

discovered, had themselves murdered Hemmings. Evidence of the malice of the prisoner was given without objection, and it was then proposed to show that Hemmings was the person by whom the rector was murdered. This was objected to, but Littledale, J., decided that it was admissible.

In *Hunter* v. *The State*, 43 Ga. 483, it was held competent, as tending to show motive on the part of the accused, to prove that he was the rejected and the deceased the accepted suitor of a particular lady, and that rumors of an .approaching marriage between the lady and the deceased were brought to the knowledge of the accused. The court there said : " In the administration of the criminal law, any fact shedding light upon the motives of the transaction will not be excluded from the consideration of the jury, whether it goes to the attestation of innocence or points to the perpetrator of the crime." For a like purpose it has been held competent to show that the defendant and deceased both sustained a relation of illicit intercourse with the same woman. *State* v. *Larkin*, 11 Nev. 316 ; that the prisoner was in the habit of having illicit intercourse with the wife of the deceased. *People* v. *Stout*, 4 Park. Cr. Cases, 71 ; that the step-children of the accused, with one of whom he had illicit intercourse, had left his house and gone to that of the deceased, who refused to give them up. *Fraser* v. *The State*, 55 Ga. 326 ; that the deceased had a few days before killed a near relative of the prisoner. *Kelose* v. *The State*, 47 Ala. 573 ; and in *People* v. *Hendrickson*, 1 Park. Cr. R. 406, and *State* v. *Green*, 35 Conn. 203, in which cases the prisoners were charged with uxorcide, it was held competent to anticipate the presumption of conjugal affection and show, in the one case, that the prisoner was not in truth the husband of his supposed wife, because he had a living wife at the time of his marriage to the deceased, and, in the other, that by the will of the wife's father the prisoner had been disappointed in his expectations of pecuniary gain in becoming connected with the family. In many of these cases the expression is used that even where such evidence is inconclusive and of but slight value, it is proper to submit it to the jury under admonition, not to assume the crime from the mere motive.

It would be difficult to imagine a case in which such evidence should be admitted if it was incompetent under the facts of the present one.   If the testimony of the state's witness was believed by the jury, the defendant, by his own declarations, had connected the malice of Dr. Jones towards the deceased and his desire to have him driven from his plantation, with the killing, as the motive by which he was impelled.

It appears as an uncontroverted fact that the appellant had never seen or heard of Kleinfelder until the day before he with young Jones appeared on the farm.   Naturally the accused would have insisted before the jury that a killing so barbarous and horrid as that testified to by the state's witness could not occur without some motive potent enough to impel the act, and that he, a confessed stranger to the deceased and his affairs, without hatred or ill-will of any kind against him, and without occasion for desiring to injure him, could not, in the nature of humanity, have done the deed as detailed by the witness.

In anticipation of this defense, the state laid the fountain of malevolence a step beyond, and attempted to show that the hatred towards deceased resided in another, and that the prisoner murdered him because of the procurement of that other.   The fact of the killing stands confessed ; its details are alone in controversy. According to the state's witness, the killing was of unparalleled barbarity, so exceptional in character as to stagger credulity, but for the fact that the wounds on the body and the incumbered hands of the dead man, lend potent corroboration to his story.   The defendant claimed that he was the party assailed, and that he killed the deceased in necessary self-defense.   Under these circumstances, it was especially important that the state should, if possible, establish the motive of the crime.   Looking to the whole evidence, that for the state and the defense, it is not difficult to trace the crime from its inception to its consummation.   On the 30th of October, according to defendant's own testimony, he was employed by Dr. Jones to go to the plantation to guard convicts who were to be secured in the following January.   Young Jones and the appellant, armed with two Winchester rifles and pistols, with one change of

underclothing for the two, and fully supplied with cartridges, left Kosciusko for the plantation the next day. In two weeks' time Jones was rid of the man whose presence on his plantation annoyed him, and the appellant stood before the jury explaining how the deceased, with a bottle of coal oil in one hand and two hams and a knife in the other, made a sudden and violent assault upon him, who was then armed with a Winchester rifle, and how, in defense of his life, he slew him.

Under the facts of this case, if the evidence admitted to show motive were as clearly incompetent as under the law it is competent, we should still hesitate to disturb a verdict otherwise so abundantly supported.

It remains to notice but a single other exception. After the homicide, according to the testimony of Williams, young Jones promised the accused to send a telegram to his father to procure him to become surety upon appellant's bond to appear and answer for the killing. When upon the stand as a witness for the defendant, Jones was asked if he had sent the telegram, and without objection by the defendant, replied that he had. He was then asked to state its contents, whereupon the defendant objected on the grounds, first, that the telegram was the best evidence of its contents, and second, that it was incompetent in any event against defendant. The court seems not to have ruled upon the whole objection. The bill of exceptions states that the judge ruled that the witness could not be required to answer until the telegram should be first shown him. Whereupon the witness, without waiting for the court to direct him to answer, replied, giving the contents of the telegram as follows: "Eugene killed Barney, justifiable—will be home on to-morrow's A. M. train."

We are not prepared to say that this evidence should have been admitted, but since no objection was made to the evidence of the fact that the telegram was sent, we find nothing in its contents as proved tending to the injury of the defendant.

*The judgment is affirmed.*