## MOORMAN v. STATE.

[69 South. 1000.]

1. HOMICIDE. *Evidence. Admissibility. Appeal. Harmless error. Trial.*

In the trial of a case of homicide where the theory of the defense was that deceased was the aggressor and where accused testified that deceased threatened him when he was found in the house of deceased's mistress, and that after his escape from the house, deceased drew him into a quiet place and again threatened to kill him, evidence of deceased's relations with the woman tending to show a reason for his jealousy was admissible.

2. HOMICIDE. *Appeal. Harmless error.*

Where prosecuting counsel, when called as a witness, volunteered a hearsay statement that the woman in the case was accused's mistress, the failure of the court to exclude such statement on objection was prejudicial to accused.

3. CRIMINAL LAW. *Trial.*

It was improper for the prosecuting attorney in a trial for murder to use the son of deceased as a model to show the jury how the wounds were inflicted, since this would tend to unduly arouse the sympathy of the jury for the family of deceased.

APPEAL from the circuit court of Pontotoc county. HON. CLAUDE CLAYTON, Judge.

Oscar Moorman was convicted of murder and appeals. The facts are fully stated in the opinion of the court.

*R. N. Miller,* for appellant.

*Lamar F. Easterling,* Assistant Attorney-General, for the State.

STEVENS, J., delivered the opinion of the court.

Appellant was convicted of the murder of one John Creed, marshal of the town of Pontotoc, and sentenced to life imprisonment. The homicide occurred abut ten o'clock on the evening of July 4, 1914. Appellant at the time was an unmarried man, twenty five years of age, living with his widowed mother about one mile east of the town of Pontotoc. Deceased was a widower, and marshal of the town. The killing occurred at night on one of the sidewalks in the business district of the town. There were no eyewitnesses, except a Mr. Baw testifies on behalf of the state that he heard the report of a pistol and saw from the window of his store the figure of a man firing the pistol. He did not pretend to recognize either party to the conflict. The proof shows a difficulty an hour or two before at the house occupied jointly by a negro woman, Roxie Morgan, and a negro girl, Pearly May Jackson. The contention of appellant is that he was at the house named to visit Pearly May Jackson for immoral purposes; that at this time this negro girl was the mistress of the deceased; that while appellant was in one of the front rooms of the little four-room dwelling, deceased came to the door of one of the back rooms and engaged in a loud conversation and quarrel with Pearly May, telling her that he knew appellant was there, and demanded to know what his mission was, and that the girl should order him to leave. When the girl denied responsibility for appellant being there, deceased bade her good-bye, and apparently left; but a few minutes later he burst open the back door of one of the rooms, at the same time using some profane and vile language toward appellant, the exact words of which

109 Miss. 54

it is not necessary to detail, and declaring his intention to kill appellant. Appellant, who had already removed his hat and shoes, thereupon jumped out of the window and avoided the personal difficulty, although he was then armed. After deceased had left the premises, appellant then went back to the house to get his shoes and hat, but found that both were gone. He thereupon borrowed a straw hat and a pair of slippers and went back into the heart of the town, where he was talking with two of his acquaintances, Herman Enis and Woody Stockton, when Mr. Creed, the deceased came across the street in the direction the three were standing. It is the further contention of appellant that deceased in approaching stated to appellant, "I want to see you a minute," and took appellant around behind a barber shop, in the dark, where the killing occurred.

The facts thus far stated and contended for by the defense were not contradicted by witnesses for the state, except that it is the theory of the state that the negro girl in question was the mistress of appellant, and not of the deceased; that deceased, as town marshal, had a right to be at the negroes' house; that, when appellant was frightened or run away by the marshal and caused to depart without his shoes and hat, appellant went up town in search of the marshal, and himself called Mr. Creed around the corner with the statement, "I want to see you a minute; come here," and lead deceased to a secluded and dark spot with the deliberate purpose of taking his life, and did, in fact, deliberately shoot deceased five times, without any justification whatever.

Just exactly what happened when the parties walked around behind the barber shop no one but appellant is in position to say. As a witness in his own behalf, he testifies that deceased grabbed him in the collar with his left hand and threw his right hand back to his hip pocket and said, "God damn you; you were down in my woman's house. I'm going to kill you;" that thereupon

appellant fearing for his life, drew his pistol and began to fire; that deceased grabbed the end of the pistol, and in the struggle pulled appellant to the ground, appellant firing as rapidly as he could his automatic pistol. Appellant says:

"He fell and pulled me down on him, and I just kept firing until I got loose of him."

He further says:

"He told me he was going to kill me. That is the reason I shot him. I shot him to save myself."

Several witnesses for the state gave their version of the reports from the pistol and of outcries of distress and for help uttered by deceased while the firing was going on. There is considerable damaging testimony on the part of the state also to the effect that appellant walked and ran hurriedly down the street with pistol in hand, declining to make any explanations to those he passed; that he fled to the home of his brother, about eight miles in the country, where he was pursued by the sheriff and his posse, and only captured after being shot down. The other details of the tragedy and evidence in the case need not for the purposes of this opinion be detailed.

There are many assignments of error, most of which complain at the method in which the jury was impaneled and the refusal of the court to sustain challenges to jurors and to permit counsel to propound to the jurors questions in addition to those propounded by the court. The fourteenth, fifteenth, sixteenth, seventeenth, and nineteenth assignments are as follows:

"(14) Because the court erred in sustaining the objections of the state to the offers of evidence by the defendant to prove by the witness, Roxie Morgan, and by defendant's own evidence on the stand, the details of the difficulty at her house between the deceased, Creed, and the defendant just a few moments before the killing, and in refusing to allow the defendant to show by this

witness that Creed, the deceased, attacked the defendant there in her house out of a motive of jealousy, and that Creed, the deceased, was enamored by a negro girl, Pearly May, living in the house with Roxie, and that he (Creed) was living with this girl as his mistress, and that his anger against the defendant was caused by jealousy in finding the defendant at that house.

"(15) Because the court erred in refusing to permit the defendant to prove by the witness Robert Carr that Creed, the deceased, had bought furniture for his mistress, Pearly May, as corroborative of the fact that she was living with him as his mistress in adultery.

"(16) The court erred in refusing to permit the defendant, on objection by the state, to prove by the colored man, Farr, and his wife, that Creed, the deceased, had hired him and his wife to cook for Pearly May, and to watch her and to see that she associated with no other man than Creed, the deceased, as noted in the record of the trial by the stenographer.

"(17) The court erred in refusing to permit the defendant, on the objection of the state, to prove the details of what occurred between Creed, the deceased, and the defendant at the house of Roxie Morgan just a short time before the meeting in which Creed was killed, and to prove by the witness Carr and by the colored man, Farr, and his wife, that Creed was living with Pearly May as his mistress, and had attacked the defendant in her house out of motives of jealousy not more than one hour before he was killed, and that when he met him the second time when Creed was killed, that his assault on the defendant was from motives of jealousy on account of finding the defendant in Pearly May's house. This testimony was all admissible to corroborate the defendant as to who was the aggressor and the provoker of the difficulty in which Creed was killed. . . .

"(19) Because the court erred in permitting the district attorney in his closing speech to lay a man down

on the floor and take a stick and demonstrate his theory of the wounds in the dead man's body, and thus depriving the defendant of any right to cross-examine; their being nothing in the evidence to warrant any such demonstration."

Appellant offered to prove that deceased for a long while previous to the homicide was in the habit of paying regular visits to the negro girl in question, and of going into her room and being there shut up with her for some time during each visit; that he had purchased for her a suit of furniture from the Carr Furniture Company; that he had paid regularly her grocery bills; and that he was, in fact, living in adultery with her, and was at the time he lost his life actuated by jealousy, and on that account was the aggressor in the conflict.

The court declined to permit certain witnesses to answer interrogatories intended to establish the facts indicated and to show illicit relations between deceased and Pearly May Jackson; and the refusal of the court to admit this line of testimony is, as reflected by the assignments of error, complained of.

In our judgment, it was error to exclude the testimony offered on behalf of the defendant. It is the theory and contention of the defendant that deceased was the aggressor, and—

"bearing upon the question as to whether the grounds for fearing death or serious bodily harm were reasonable, defendant had the right to lay before the jury all circumstances which go to show the character of the threats, the intention with which they were made, and the grounds of fear on which the defendant acted." *Russell* v. *State*, 11 Tex. App. 288.

"The circumstances which might excite a desire to kill are innumerable. . . . Circumstances involving the sexual passion, in one aspect or another, and usually operating through the emotion of jealousy, may lead to a desire to kill." Wigmore on Evidence, vol. 1, par. 390.

The same principle of law that admits evidence of threats by deceased against the defendant justified the admission of the evidence proffered in this case.

"Considerable latitude is allowed on the question of motive. Just in proportion to the depravity of the mind would a motive be trifling and insignificant which might prompt to the commission of a great crime. We can never say the motive was adequate to the offense; for human minds would differ in their ideas of adequacy, according to their own estimate of the enormity of crime, and a virtuous mind would find no motive sufficient to justify the felonious taking of human life." *Hendrickson* v. *People,* 10 N. Y. 13, 61 Am. Dec. 721.

Appellant in the instant case brought himself within the rule requiring him to show some overt act on the part of deceased. He tells the court and jury that down at the negro house deceased burst open the door to the room where appellant was, exclaiming, "Where is the damned son of a bitch? I am going to kill him;" that thereupon he (appellant) "hopped out of the window and ran off;" that he knew deceased was an officer, and he supposed deceased went armed all the time; that up town at the time of the difficulty deceased invited him around the corner in the dark saying, "God damn you; you were down at my woman's house; I'm going to kill you," and thereupon took hold of appellant with one hand, and threw the other back to his hip pocket as if to draw a pistol. This satisfies the requirement announced by the court in *Spivey* v. *State,* 58 Miss. 858, as follows:

"It must first appear that there was an attack, and then the accused, who was the object of it, may show whatever will throw light on the question whether he had just ground to believe that the attack was felonious and dangerous."

"The circumstances under which a threat was made are competent to explain its meaning and significance,

and, when known to the defendant, to show the effect upon his apprehensions. . . . For the same purposes also it is competent to prove any circumstances bearing upon the nature and cause of the deceased's enmity toward the defendant.'' Ency. of Evidence, vol. 6, 795, 796.

A case very similar to the case at bar is that of *Gafford* v. *State,* 122 Ala. 54, 25 So. 10. In that case the defendant claimed to have acted in self-defense and the testimony was in conflict as to who was the aggressor. It was testified that deceased had made threats against the defendant's life, and the defendant offered evidence of adulterous relations between the deceased and the sister of the defendant as showing a motive for the attack on the part of deceased and the reasonableness of defendant's fear of bodily harm. This evidence was by the trial court excluded; and the appellate court, in reviewing the authorities and reversing the case, says:

''We cannot avoid the conclusion, in the light of the foregoing authorities, and that portion of the evidence tending to show that deceased was the aggressor, with a deadly weapon, that the exclusion of the testimony offered by defendant as to deceased's relations with defendant's sister deprived the jury of proof which, if admitted, might, in their opinion, have shed light upon the main inquiry in the case, and as to which the testimoney before them was so hopelessly conflicting. . . . With no facts before them to illustrate the character of deceased's threats of that day, or furnishing an inference for a motive on his part to attack defendant, the jury could not, under such circumstances, have reached any other conclusion than that they did reach; viz., that the defendant was the aggressor. But if it had been shown to them that, notwithstanding deceased's denials to defendant of improper relations between deceased and defendant's sister, such relations, in fact, existed

then, and had existed for a considerable length of time previously it may well be that the jury, from their knowledge of human nature and the history of like cases, might in the light of such testimony, have inferred a motive on deceased's part to remove a dangerous obstacle out of the way of his illicit enjoyment. However that may be, such testimony would have shown the cause of the enmity of the deceased towards the defendant, its intensity, and would have tended to show a reasonableness of defendant's apprehension of danger of death or serious bodily harm from the attack made upon him by deceased, if the jury should believe that such an attack was made. We are, at all events, persuaded that, with the testimony referred to before them, the jury would have been enabled to balance more justly the substantial merits of the question of self-defense by reason of a fuller and juster apprehension of the defendant's real position at the critical moment of the fatal encounter and the real state of feeling then existing on the part of each.

We cannot, on the facts of this record, say that this error was not prejudical, especially when the district attorney, called as a witness for the defendant to show just what occurred immediately after the homicide, and when he, as a member of the sheriff's posse, went to the negro woman's house, voluntarily stated to the jury that somebody suggested that "Oscar Moorman kept a negro woman by the name of Pearly May Jackson," thereby possibly imbuing the jury with the idea that the negro girl was the mistress of appellant. The defendant objected to this statement of the witness, and moved the court to exclude it but the court declined to rule out this voluntary hearsay statement. We are not called on to decide whether the prosecution could not have shown adulterous relations between appellant and the woman. No direct evidence of this character was of-

fered.  In this case, as in the case of *Russel* v *State,*
*supra*:

"The issue being, 'Had the    defendant    reasonable
grounds for fearing death or serious bodily harm?' to
decide this question correctly, the exact relations of the
parties to one another, their feelings toward each other,
and their motives should be known by the jury.  These
being understood, an act, gesture, or word which was
spoken or done at the homicide is viewed and weighed
in the light of these remote relevant facts, as well as the
immediate facts."

It is fairly shown by the whole evidence that deceased
was in his shirt sleeves, and had, in fact, no pistol with
him.   There was found, however, upon his body what
witnesses term a "slung-shot" loaded with lead.  It was
for the jury, of course, to pass upon the weight and the
value of all the testimony.   It is our province simply to
decide that the evidence offered had a tendency to shed
light on the main inquiry as to self-defense pleaded by
the defendant.   Our holding is in perfect accord with
the principles announced by our court in *Brown* v. *State,*
88 Miss. 166, 40 So. 737.

Inasmuch as the case must be reversed for a new
trial, it is unnecessary for us to pass upon any of the
many assignments of error complaining of the method
in which the jury was impaneled and the refusal of the
court to sustain challenges for cause.

Complaint is also made of the action of the district
attorney, during his closing argument, in calling around
Willie Creed, son of the deceased, and laying him down
upon the floor and using him as a model to demonstrate
to the jury the range of the bullets.   Exception was duly
reserved by the defendant at the time, and, regardless of
actual intent, this closing act of the state's attorney was
calculated to arouse unduly the sympathy of the jury
for the family of the deceased.   While this alone might
not be reversible error, we hold this action on the

part of any district attorney improper. It is the duty of the district attorney, as well as of this court, to see that the accused enjoys to the fullest extent his constitutional right to a fair and impartial trial by jury.

Conscious of our duty to see that the law is enforced, and of sustaining all legal convictions, we are, upon the entire record, impressed with the vital importance of this case to the defendant, and that the error of the court in excluding the testimony offered by the accused is prejudical, and requires a reversal of the case.

*Reversed and remanded.*