## CLARK v. STATE.

[85 South. 188, In Banc.  No. 21281.]

1. HOMICIDE.  *Fact that exhibition of a weapon accompanied admissible threat is admissible.*

   In a prosecution for murder where a threat made by the deceased against the accused is admissible in evidence, the fact that it was accompanied by the exhibition of a weapon by the deceased is also admissible.

2. HOMICIDE.  *Conditional threats admissible.*

   A conditional threat is not inadmissible in evidence merely because it is conditional.

3. HOMICIDE.  *Circumstances under which threats were made are admissible.*

   In a prosecution for homicide, the circumstances under which a threat admissible in evidence was made are competent to explain its meaning and signficance.

4. HOMICIDE.  *Circumstances under which threats made admissible as bearing on who was aggressor.*

   In a prosection for homicide, where the evidence as to who was the aggressor is in conflict, evidence that a short time before the killing the deceased ravished the wife of the accused is admissible, when immediately after the rape the deceased told the wife to tell the accused that he had raped her and that he would kill the accused and then have her all to himself.

5. HOMICIDE.  *Evidence tending to show the state of mind of deceased and accused toward each other is relevant.*

   In a prosecution for homicide, where the evidence as to who was the aggressor in the fatal encounter is in conflict, the state of mind of each of the participants therein toward the other is a material inquiry, and any evidence pertaining thereto is relevant, and unless incompetent on some other ground should be admitted.

APPEAL from circuit court of Forrest county.

HON. R. S. HALL, Judge.

Eugene Clark was convicted of murder, and he appeals.  Reversed and remanded.

*Tally & Mayson* and *Currie & Currie,* for appellant.

The law seems settled that in the establishment of threats it is not only competent to prove the naked words but it is also competent to prove in connection therewith and as a part thereof the possession of weapons and means with which to execute the threat; in such a case the weapon and the exhibit of it is part and parcel of the threat, an essential element of it, for threats without any means of executing, it would seem, might well be considered harmless.

We submit that the action of the court in excluding that part of the testimony of these two witnesses offered to prove that the deceased Boles was armed with a pistol and that he exhibited the same at the time he made these threats, was manifest error and that such rulings resulted in injury to the appellant cannot be disputed.

We contend that the most grevious error of all was committed by the court in excluding the testimony of Jessie May Clark, wife of appellant, as offered by appellant as appears on R., pp. 274 to 278, and also the testimony as offered by appellant himself in his own behalf.

The court also excluded the testimony offered by appellant in his own behalf, that this conduct and threat on the part of deceased was communicated to him by his wife and that he never saw deceased after that until he was suddenly and unexpectedly confronted by deceased at the Pine Grove School house, about two weeks later, when the killing occurred.

And to support our contention that this evidence was perfectly competent and to exclude it was to cut the very heart out of appellant's case, we rely upon what this court said, speaking through Judge STEVENS, in *Mooreman* v. *State,* as reported at page 848 in 109 Mississippi. *Brown* v. *State,* 88 Miss. 166, 40 So. 737.

We submit that the law as laid down in the case of *Leverett* v. *State,* as announced in the opinion of that court, beginning on page 403, 112 Miss., 73 So. 373, correctly states the law both as to the manner of qualifying jurors and as to the disability of evidence and that case applies to the competency of the evidence in this case and is decisive of this case and applies herein to the competency of the evidence excluded in this case as offered on the part of appellant himself and by his wife. *Harris* v. *State,* 72 Miss. 99, 16 So. 360; *Holly* v. *State,* 55 Miss. 424.

In conclusion we wish to call the court's attention to the many errors we think committed by the court in admitting testimony for the state over the objection of the appellant as shown throughout the entire record, and excluding testimony offered by the appellant as shown throughout the whole record, all of which tended to establish in the minds of the jury that it was the fixed and settled opinion of the court that: "The self-defense story in this case is 'trumped-up.' The defendant is trying by this means to plead the unwritten law."

We respectfully submit that the action of the court in ruling out the testimony of appellant and his wife alone, is sufficient to entitle the appellant to a new trial, but we most earnestly contend that viewing this record as a whole and studying carefully the many errors committed against the appellant, that the trial court was in error in its ruling and that the court's errors in excluding evidence so vital to the appellant's case, not only amply warrants but demands at the hands of this court that this case be reversed and a new trial granted.

We therefore respectfully submit that this case should be reversed.

*W. M. Hemmingway,* Assistant Attorney-General, for the state.

The accused and the deceased were rivals for the hand of Jessie May Owen, who married the accused. The deceased made threats against the accused before the marriage and about two years and a half before he was killed. Some of these threats were communicated to the accused, and in this state of facts, if there was any attempt on the part of the deceased to put his threats into execution, the right of the accused to anticipate the attack would not have been denied. The accused offered in evidence the story of threats made by deceased to defendant's wife at the time of an assault upon her by the deceased. This was excluded by the court in the second trial because it conflicted with her testimony in the first trial as to the threats, but not as to the assault. Accused complains of this when, really it was to his benefit, for had it been admitted, it could only have come to a question of malice and of motive on his part, and would have deprived him of the lawful right to anticipate the overt acts, if any, made by the deceased, so upon this point he has no right to complain of injury. *Cotton* v. *State,* 17 So. 372.

Admission of the testimony of the wife of the accused might have offered opportunities for a jury debate, but in so far as the legal aspect is concerned, accused is benefited by its exclusion. The accused testified, that at one time he had had a conversation with the deceased and that was after the first threats had been made. He claims, however, that renewed threats were communicated to him a few days before the killing.

Accused further complains that the court erred in not admitting testimony offered to show that when threats were made by the deceased he was armed; one of these times being at Mobile. He cannot have been injured by this exclusion according to the theory of the case by appellant, that is, that the whole case depends upon who was the aggressor at Pine Grove School House. The demonstration with the pistol was too far away to be

classified as an overt act, both as to time and distance. The threat was the important matter and that is claimed to have been communicated by various people; and he had the benefit of uncommunicated threats. It is not relevant as to what they were to be if it is sufficient to show malice or motive, and that that at the school house was accompanied by an overt act. Accused had the benefit of everything to which he was entitled.

Appellant also complains of refused instructions as to character: "The court instructs the jury for the defendant that satisfactory evidence of the good character of the accused, if such has been shown, may itself be sufficient to arouse a reasonable doubt of the defendant's guilt."

"Evidence of the good character of the accused should go to the jury as any other fact, and its influence in the determination of the case should be left to the jury without any intimation from the court of its value. The court should not tell the jury that satisfactory evidence of the good character of the accused is or is not sufficient to raise a reasonable doubt of his guilt. The jury is to have this evidence as an aid to estimate the other evidence and by the light of the whole to reach a verdict." *Coleman* v. *State,* 59 Miss. 484; *Hammond* v. *State,* 47 Miss. 214; *Powers* v. *State,* 74 Miss. 777. This instruction was properly refused.

The other instructions certainly give the defendant the benefit of everything to which he was entitled. The one on page 9 would alone have been sufficient to have put defendant's case before the jury. The two theories were given, on the whole case; the defendant had a fair trial in that his side was presented. Any additional testimony could not have made him act differently. Threats had been communicated to him; he armed himself and went into the encounter with all the protection of the law; and he was tried and convicted on the occurrence at Pine Grove School House; and he had in-

structions giving the benefit of self-defense and the right to anticipate the hostile movement.

SMITH, J., delivered the opinion of the court.

This is an appeal from a conviction of murder. The killing occurred at the close of a concert at the Pine Grove School near Hattiesburg, Miss. The main room of the school building, in which the killing occurred, is twenty-six feet long with a stage in the rear. The major portion of the room is occupied by desks for the scholars separated with two aisles extending from the front to the rear. The distance between these aisles is about three feet, that being the length of the desks separating them. On the occasion in question, the appellant was the stage manager and remained on or back of the stage while the concert was being given. At the close of the performance, the deceased, Kramer Boles, was standing at the door of the room immediately in front of the stage and apparently between the two aisles When the appellant left the stage, he came down the right aisle, spoke in passing to his brother, who sat a few feet from the stage, then to his wife, who sat a few feet further therefrom, and then, according to the evidence for the state, suddenly drew a pistol and shot the deceased, who had made no demonstration of hostility toward him, and who was then either standing at the door or had taken two or three steps therefrom toward or down the left aisle, and who was armed only with a knife that was found in his pocket after his death. After he was shot, the deceased walked down the left aisle and fell a short distance from the stage. According to the evidence for the appellant, when he (the appellant) left the stage and started down the right aisle the deceased left the door and came down the left aisle, which would have brought him within three feet of the appellant, with his hand thrust into his shirt bosom, from which

he with some difficulty drew a pistol with the evident intention of shooting the appellant; that when the appellant fired the deceased dropped his pistol, walked a few feet further down the aisle, and fell.    The appellant testified that he shot the deceased in  self-defense only.

The state offered no evidence tending to disclose any motive on the part of the appellant for  the killing of Boles, and none other than self-defense appears from the record, unless from certain evidence offered by the appellant, which will be hereinafter referred to, but which was excluded by the court.

It appears from evidence introduced by the appellant that he and the deceased two years or more before the killing were both in love with Jessie May Owen, and that she had rejected the deceased and accepted the appellant; that about two months before Jessie May married the appellant the deceased stated that in event she married him he intended to kill the appellant; that the deceased seemed to brood over his rejection by Jessie May and her marriage to the appellant, and on several occasions thereafter stated to various persons that he intended to kill the appellant.

About six months before the killing, James Logan asked the deceased if he had not been talking about Mrs. Clark, and he replied:

"That was some more of Gene Clark's God damn lies. I would have killed him the other evening if Ma and Jeff would have let me have the gun, and I will kill the God damn son of a bitch if he ever crosses my path again."

A short time after this conversation with Logan, the deceased met Joe Brogan in the public road and, in the language of Brogan:

"I met him there.   He had a gun on his shoulder, and I asked him to let me see it.   He handed it to me, and then said, 'Wait a minute,' took the gun and broke it

and took the loads out. I said, 'You must be looking for big game.' 'No,' he said 'I had them rung to kill Gene Clark with, if he had come a little closer while ago I would have killed him. The God damn son of a bitch! I will kill him yet.' "

On March 28th, prior to the killing which occurred on April 25th following, the deceased met Mike Clark in the city of Mobile, Ala., and on being informed by the deceased that he was going home Clark asked him to deliver a message to Eugene Clark, and he replied: "Damn Eugene Clark! He would shoot his brains out if he got a chance."

The wife of the appellant testified, but her testimony was excluded by the court, that on the morning of the 6th day of April, nineteen days before the killing, the deceased came to her residence a short while after her husband had left and forcibly ravished her; that after accomplishing his purpose he said to her that—"I could tell that son of a bitch of a husband if I wanted to that he had been there and raped me, and then he would kill him and have me all to himself."

All of which was communicated by her to her husband.

Two or three days before the killing, the deceased stated to several persons in a cafe in the city of Hattiesburg that he intended to kill the appellant before Saturday night. On probably the same day of the making of the treat by the deceased in Scott's Cafe he had a conversation with Eugene Boykin, who testified:

"I was on the corner of Mobile and West Pine streets when Boles came up. He said he had been working at the shipyards in Mobile and wanted to know if I had seen any one going home. I had not seen any one but Eugene Clark, I told him. He said: 'Hell with Gene Clark! Is he by himself?' I said, 'I don't know.' He said, 'If I knew he was, I would go out with him and cut his damn throat.' I said, 'That might be a two-handed game,' and

he said, 'What it takes to hold him I have it,' and pulled back his shirt and showed a nickel-plated gun.

"Q.  Gun or pistol?  A.  Pistol."

The appellant offered, but was not permitted, to prove that the deceased exhibited a weapon in connection with the threats made by him against the appellant to Mike Clark and in Scott's Cafe.

On probably the day before the killing, the deceased also had a conversation with Bogue Chambliss, who testified that—

"A.  I had a knife, a long, dark-bladed knife, and Boles wanted to swap me out of it, and I swapped with him When we got in the wagon, he said, 'I would not take fifty dollars for it.' I asked him what he wanted with it, and he told me Eugene Clark, a God damn son of a bitch. If I ever live to get my hands on him, I am going to cut him—God damn him—as long as there is a piece to cut.

"Q.  Was anything else said?  A.  I asked him what it was about.  He said, 'Just what I told you before it was about.'  So I went on and tried to explain the thing to him.

"Q.  Tell what you said to him and what he said to you. · A.  I said that was all right when you were children, but you are men now, and someone will kill you or you will have to kill someone.  He said: 'The son of a bitch will never kill me if I ever get my hands. I said 'The best thing you can do is to leave that alone.' He said he be God damned if he would leave it alone."

The last threat against the appellant was made by the deceased just a few moments prior to the killing and was proved by Dewey Hatton, who testified that—

"We were on the inside of the schoolhouse, and he said, 'Let's go smoke a cigarette.' We went on the outside and were standing there by the window, and he said, 'You see that son of a bitch behind that curtain.' I said, 'No, who is it? He said, 'Eugene Clark; I am going to cut his God damned throat if I ever get the chance.'

"Q. What did he have? A. Knife.

"Q. What kind of a knife? A. Bright looking knife about seven inches long."

The evidence that the deceased was armed with and exhibited a weapon at the time he stated to the witness Clark and in Scott's Cafe that he intended to kill the appellant should not have been excluded, for it tended to show, not only that the deceased was earnest in making the treat, but that he possessed the means with which to put it into execution, thereby adding to the probability that he was armed at the time of the difficulty, which resulted in his being killed, and that he was the aggressor therein.

The threat made to the appellant's wife should also have been admitted, and the fact that it was apparently conditional, in that it was to kill the appellant in event the witness told him that she had been raped by the deceased is immaterial. Such threats are not inadmissible merely because they are conditional (6 Ency. of Evidence, 639), and if the inadmissibility of the one here in question depends on the happening of the prescribed contingency, as to which we express no opinion, that condition was here met, for the witness told the appellant that the deceased had raped her.

The evidence of the rape itself should also have been admitted, for "the circumstances under which a threat was made are competent to explain its meaning and significance." 6 Ency. of Evidence, 795; *Moorman* v. *State,* 109 Miss. 848, 69 So. 1000. Moreover, it tended to show the nature, cause, and depth of the deceased's enmity toward the appellant, which, if the evidence of the appellant's witnesses is true, was caused by the fact that Mrs. Clark had rejected him and married the appellant. 6 Ency. of Evidence, 796; *Leverett* v. *State,* 112 Miss. 403, 73 So. 273. If this rape was not explanatory of its accompanying threat and had no bearing on the nature and cause of the deceased's enmity to-

ward the defendant, it, of course, would not be admissible in evidence.

The evidence as to who was the aggressor in the fatal encounter, on the solution of which the guilt or innocence of the appellant depends, being in irreconcilable conflict, the state of mind of each of the participants therein toward the other was a material inquiry, and any evidence pertaining thereto was relevant and, unless incompetent on some other ground, should have been admitted.

"The law furnishes no test of relevancy. Unless settled by statute or controlling precedent, relevancy is to be determined by logic, being the application of the principles of reason, judgment, and systematic arrangement to the matter in hand. All facts which tend either to sustain or to impeach a logically pertinent hypothesis are admissible. But no facts are relevant which do not afford a reasonable presumption or inference as to the principal fact in issue, or which do not make more or less probable such a hypothesis." 1 Wharton's Criminal Evidence, section 24; 11 Ency. of Evidence, 174.

*Reversed and remanded.*