GREGORY *v.* STATE.*

(Division A. Nov. 12, 1928. Suggestion of Error Overruled Dec. 10. 1928.)

[118 So. 906. No. 27332.]

134

*Corpus Juris-Cyc References: Criminal Law, 16CJ, section 2021, p. 793, n. 94; section 2047, p. 805, n. 98; Homicide, 30CJ, section 561, p. 316, n. 68; section 653, p. 406, n. 17; section 660, p. 417, n. 91; section 712, p. 446, n. 38.

*W. M. Edwards* and *L. J. Broadway,* for appellant.

*J. A. Lauderdale,* Assistant Attorney-General, for the state.

Cook, J. The appellant, H. C. Gregory, was indicted and tried in the circuit court of Clarke county for the murder of his wife, and was convicted of manslaughter, and sentenced to the penitentiary for ten years; and from this conviction and sentence he prosecuted this appeal.

About six o'clock in the evening on December 28, 1927, the wife of appellant was shot with a pistol. The bullet took effect in the upper part of her chest near the heart, and she died from the effect of the wound about twenty-four hours later. She was in her home at the time she was shot; and her husband, the appellant, and their ten-year-old son were present when the shot was fired.

S. A. Boykin, a witness for the state, testified that he lived about twenty-five yards from the home of appellant; that he heard the pistol shot, and that a few minutes later he heard the son of appellant run up the street screaming; that he then went to the Gregory home, and, upon reaching there, found Mrs. Gregory lying on the bed with her clothing pulled up around her neck and head so as to interfere with her breathing; that appellant was raising her up and letting her fall back upon the bed, and he requested him to let her remain quiet; that, when he asked appellant "what was the matter," he replied:

"My wife got in one of her tantrums and tried to kill herself—shot herself. I have sent for a doctor, but I am in hopes that she will be dead before he gets here."

He further testified that, after he spoke to him, appellant removed her clothing from around her head and face, and she began to breath freely, and that a few minutes later she said to appellant, "You done it—you done it—you done it;" that he replied: "Oh, darling, I did not do it," and slapped his hand over her mouth; that a little later she said to appellant, "You were the cause of it; you done it—you done it—you done it," and he again denied it. All of this testimony was admitted without objection.

For the appellant, after a predicate had been laid for the admission of the statement as a dying declaration, the doctor who attended the deceased testified that she said to him, "I did it myself." The nurse who attended the deceased while she was in the hospital testified to a dying declaration made by the deceased, her version of this declaration being as follows:

"Mrs. Gregory said at first that they had had a family quarrel, and she told her husband that she was going to kill herself, and that he went and got the gun and shook the cartridges out of it and gave it to her, and she put it back together and snapped it, and it did not fire, and she snapped it again and she shot, and she said, 'I did it all myself.'"

A deputy sheriff, who was present when the deceased made this statement in the presence of the nurse, gave substantially the same version thereof.

Hugh L. Gregory, the ten-year-old son of the appellant and the deceased, testified that his father and mother and a Mrs. Garner went to the woods to procure brush brooms; that, after returning home, his father and mother quarreled about the relations between his father and Mrs. Garner; that his mother was sitting in a rocking chair, and he (the witness) was standing at the back

of the chair; that his father went to a bed, and got the pistol from between the mattresses, and then unbreeched it and hammered it on the bed, and then snapped it together, and handed it to his mother; that she took it and placed it against her chest, and pulled the trigger twice; that his father laughed and said to her, "You can't kill yourself with an empty gun;" that his mother pulled the trigger the third time, when the pistol fired, and she fell to the floor; that his father immediately sent him after Mrs. Garner, and, when he returned, sent him after the doctor. He further testified that, when his father was getting the pistol, he shook his head at him and asked him not to do it.

The appellant testified that during the afternoon prior to the shooting, he, his wife, and Mrs. Garner went out to gather brush brooms; that his wife kept insisting on getting some whisky, and he got some whisky, and all of them drank some of it; that he discovered that his wife was drinking too much, and he attempted to take the bottle away from her, and in scuffling over the bottle it cut his wife's lips, making her very angry; that, when they reached home, they first carried Mrs. Garner to her home; that his wife was still angry with him, but he carried her into the house, and she took a seat in a rocking chair, while he seated himself in a straight chair in front of her. He further testified that his wife continued to fuss about the injury to her lips, while he insisted that she did it herself, and then she said: "I am going to kill myself this very night;" that he replied: "No, you are not going to do that, I am not going to let you;" and she then said, "I will whenever you go to sleep—I will get up and get the gun," to which he replied, "No, you will not;" that he then went to the bed and procured the pistol from between the mattresses, and threw the cylinder out, pushed the injector several times, and "almost hammered it against the bed, so that I would be sure that all the cartridges were out, and also I slapped it in my

hand that way with the cylinder slung out." He further testified that, as he walked back toward his chair, his wife grabbed the pistol as he was passing her; that, after a slight struggle over the pistol, he turned it loose, believing that all the cartridges were out of it, and that it was harmless; that he took his seat, and his wife placed the gun to her bosom, and pulled the trigger twice, and the gun snapped each time; that he then said to her, "You can't kill yourself with an empty gun," and she then pulled the trigger the third time, when the gun fired, and his wife fell to the floor; that he immediately sent his boy to call the neighbors and the doctor. He denied that he placed her clothing over her face and head so as to smother her, or that he put his hand over her mouth to prevent her from talking, and he denied that he said that he had sent for a doctor, and hoped that she would be dead before he reached there, and testified that what he did say was, "I am afraid she will die before the doctor gets here."

The first assignment of error argued by counsel for appellant is based upon the action of the court in failing to direct that a copy of the indictment and the special venire be served on the defendant or his counsel for one full day before the trial of the cause and in forcing the appellant to trial without such service of the special venire and indictment.

Section 1481, Code 1906 (Hemingway's 1927 Code, section 1302), provides:

"Any person indicted for a capital crime shall, if demanded by him, by motion in writing, before the completion of the drawing of the special venire, have a copy of the indictment and a list of the special venire summoned for his trial, delivered to him or his counsel at least one entire day before said trial. . . ."

When this case was called for trial, the defendant objected to proceeding with it, on the ground that he had not been served with a copy of the indictment and spe-

cial venire for one entire day before the trial. Upon this objection testimony was heard, and the clerk and deputy clerk of the court, and the judge who sustained the motion for a special venire and ordered the issuance thereof, testified positively that no motion, in writing, requesting such service of a copy of the indictment and special venire was filed before the completion of the drawing of the special venire or at any time. The judgment, or order of the court sustaining the motion for a special venire and ordering the drawing of the same, made no reference to a written motion for service of such copies. The testimony offered to show that such a written motion was filed is very uncertain; and we think the entire testimony on the point very clearly establishes that no such written motion was filed, and fully supports the finding of the court below that no such motion was in fact made or filed. The statute only requires the service of a copy of the indictment and special venire when such service is demanded by motion, in writing, before the completion of the drawing of the special venire; and, since no such written motion was filed in this cause, the court was not required to direct that such service be made, and the appellant was not entitled to demand any such service of copies of the indictment and special venire; and consequently the court committed no error in requiring the trial to proceed on the date to which the special venire was returnable. The appellant says, however, that, under an order of the trial judge, a copy of the special venire was in fact delivered to him or his counsel by the sheriff more than one entire day before the time set for the trial, and that this oral order of the judge and act of the sheriff constitutes a waiver of the statutory requirement that the demand be made in writing before the completion of the drawing of the special venire. There is no merit in this contention. The mere fact that the appellant was favored by the service of a copy of the special ve-

nire, which he was not legally entitled to demand, did not give him the right to demand that a copy of the indictment be delivered him one entire day before the trial. Only by a compliance with the statute can he acquire the right to demand such copies.

The principal ground upon which appellant relies for a reversal is that the testimony is insufficient to support the verdict. Section 1244, Code 1906 (section 1023, Hemingway's 1927 Code), provides that:

"Every other killing of a human being, by the act, procurement, or culpable negligence of another, and without authority of law, not provided for in this chapter, shall be manslaughter,"—and it is the theory of the state that it was culpable negligence on the part of the appellant to cause his wife to believe that the pistol which he handed to her was unloaded, when, in fact, it was loaded, and to encourage her to pull the trigger by telling her that she could not harm herself with an empty pistol, and, without protest, to stand by and see her snap the pistol at her breast, when she was under the influence of liquor and of jealous passion, without first examining the pistol to make certain that it was unloaded; and that this culpable negligence of the appellant contributed proximately to the death of the deceased.

According to the testimony of the appellant himself, his wife was under the influence of liquor to a very great extent, and was so furious with anger that she was threatening to kill herself. According to his testimony, this anger was aroused by an injury to her lips received in a struggle over a whisky bottle, while, according to the testimony of his young son, it was caused by the appellant's supposed relations with another woman. While his wife was in this condition and frame of mind, he procured his pistol, and in her presence and view took such action as to naturally and reasonably cause her to believe that he had removed

all the cartridges therefrom. He unbreeched the pistol, shook it, and knocked it on his hand and on the bed, but, so far as this record discloses, he did not look at the cylinder before he again closed the pistol up, and either handed it to his wife, or permitted her to take it from his hand with little, if any, protest. He stood by, and saw her place the pistol to her breast and pull the trigger twice. He then encouraged her to again pull the trigger by telling her that the pistol was empty, and that she could not harm herself with it. If the appellant had examined the cylinder by looking at it while he had the pistol in his hands unbreeched, he would, or should, have discovered that all the cartridges had not been removed; but, without taking this precaution, he snapped the cylinder back in place, and permitted her to place it against her chest and continue to pull the trigger, while he stood by and encouraged her by telling her that it was unloaded and harmless. Under all the circumstances involved in this record, we are of the opinion that the jury was warranted in finding that the appellant was guilty of culpable negligence, which contributed proximately to the death of the deceased.

In the case of *Sims* v. *State* (Miss.), 115 So. 217, this court said: "But culpable negligence, like reasonable doubt, is an undefinable phrase. . . . Culpable negligence must be ascertained from the facts of each case, and no iron-clad statement can be set forth as applicable to all classes of cases."

In this case the court quoted, as a general guide to a correct conclusion as to what constitutes culpable negligence, a definition in 1 Words and Phrases, Second Series, page 1174, which reads as follows:

"The omission to do something which a reasonable, prudent, and honest man would do, or the doing of something which such a man would not do, under the circumstances surrounding the particular case."

Criminality cannot be predicated upon mere negligence or carelessness, but it has been said that it may be predicated upon "that degree of negligence or carelessness which is denominated as gross and which constitutes such a departure from what would be the conduct of an ordinarily careful and prudent man under the same circumstances as to furnish evidence of indifference to consequences," and we think this statement is peculiarly applicable to the facts in this record.

The appellant next complains of the giving of an instruction submitting to the jury the question of whether he was guilty of murder, on the ground that there was no evidence warranting the submission of this issue to the jury. That a defendant who has been convicted of manslaughter may not complain of the giving of a murder instruction has been held by this court in several cases. In the case of *McCoy* v. *State,* 91 Miss. 257, 44 So. 814, it was said that "no complaint can be made here of murder instructions, since the defendant was acquitted of murder." In the case of *Carter* v. *State,* 99 Miss. 436, 54 So. 735, the court said:

"Appellant insists most earnestly that the court erred in granting instructions asked by the state. We are relieved from any consideration of the instructions relating to the crime of murder, for the reason that appellant was convicted of manslaughter, and is, therefore, presumed not to have been prejudiced by any instructions relating to the crime of murder."

See, also, the case of *Tabor* v. *State,* 99 Miss. 830, 56 So. 171.

Finally, the appellant contends that the granting of an instruction submitting the issue of manslaughter was erroneous, because the defendant was charged with murder, and there was no evidence that he was guilty of murder. Where a person is charged with murder, and the evidence makes a case of manslaughter only, it is proper to grant the manslaughter instruction.

We find no reversible error in the instructions or other rulings of the court; the evidence is sufficient to support the verdict; and therefore the judgment is affirmed.

*Affirmed.*