CROCKERHAM v. STATE.

(Division B.   May 5, 1947.)

[30 So. (2d) 417.   No. 36337.]

**Luther A. Whittington**, of Natchez, and **James A. Torrey**, of Meadville, for appellant.

**Greek L. Rice**, Attorney General, by **R. O. Arrington**, Assistant Attorney General, for appellee.

28

**L. A. Smith, Sr., J.,** delivered the opinion of the court.

Appellant was indicted and tried for murder of Turner Moreland, in the Circuit Court of Franklin County. The jury found him guilty of manslaughter and the court sentenced him to serve a term of ten years in the State Penitentiary.

Assignments of error are: Refusal to sustain a motion for a new trial on the ground that the verdict of the jury was contrary to the law and the evidence; admission of certain evidence offered by the State as to a quarrel between appellant, his wife, and one Jack Burl; overruling appellant's objection to the State's recalling the widow of the deceased, in rebuttal, allegedly in violation of the rule, which had been invoked; the granting of the State's instructions and the refusal of Instructions 1 and 2 asked by and denied to appellant.

Appellant and his wife, and the deceased and his wife, lived at opposite ends of a small "shotgun" house, not for from a woodworking plant where both Crockerham, the appellant, and Moreland, the deceased, worked for the same employer. They had been on bad terms with each other for more than a year prior to the killing on July 8th, 1946. On the 4th of July preceding, occurred the incident involving the quarrel of appellant and his wife with Jack Burl, over a mere trifle, but which they both resented bitterly. It was introduced into the evidence by the State, to show both a motive of appellant for the killing and his threat to do it. Appellant, convinced that deceased was siding with Jack Burl, said to him, according to the State's evidence, "You can take up for Jack Burl if you want to, but this is arisen and it is going to come to a head and when it comes to a head everybody is

going to know it.'' The only reaction of deceased then was to reply, ''It could come to a head right now.'' Four days later, as stated, the slaying took place.

On the day it occurred, Turner Moreland, the deceased, went to work, stacking lumber at the mill, but Chris Crockerham, the appellant, stayed at home. On that day, too, a few minutes before her husband was due back for dinner, the wife of Turner heard a pistol shot, and looking, saw Chris with the pistol in his hand. She heard her husband exclaim, ''O Lord, have mercy.'' This was on a path back of the garden, at a cattle gap, which was one of two routes followed when Turner and Crockerham went to and returned from the mill, and the more frequented way. The cattle gap was in a small depression between two slight declivities, and Chris was standing somewhat above Turner, as testified for the State, and as confirmed by the range of the bullet in the body of deceased. The widow ran down there, and eased her husband's head and straightened his legs and then ran, screaming, for help. She tried unsuccessfully to flag some passing motorists. She saw no knife or weapon by her husband's body while at the scene. She sent an acquaintance to stay with her husband until she got back, but she did not return. The body was soon removed. This acquaintance and several others, after discussion, decided to search the clothes of Turner before his removal. The only thing found in the way of a possible weapon was a small unopened pocket knife, still in Turner's pocket.

The sheriff came and arrested Chris Crockerham, who stated to the officer that, ''he came down the path to the gap and Turner was coming in and he said he spoke to Turner and said 'Turner, why don't you do some of that threatening talk in the open and not do it in the house'.'' The sheriff testified further that in this statement to him almost immediately after the killing, Chris claimed that Turner threw his hand behind him and said, ''I will do it,'' whereupon he shot Turner. The Sheriff also asked

him if he saw Turner have a gun or a knife or anything else with which to fight, and appellant replied, ''No.'' However, he claimed he did not want to wait for Turner to shoot him. On the witness stand, appellant told an entirely different story from his statement to the sheriff, ante, immediately after the event, saying to the jury: ''Turner come through the gap. He got on this side of the gap about five or six feet this side, then Turner threw this hand (showing) in his pocket. I put my hand in my bosom. Turner come out with a knife. I could see this much of the knife handle (showing) and I could see just about this much of the blade—three inches of the blade. . . . I said, 'Turner, you throw that knife down'. I spoke three or four times,'' but Turner continued to advance, he said, and suddenly sprang at appellant who shot once and fatally wounded Turner. He said Turner's wife picked up the knife. She denied doing so, in rebuttal, and, indeed, no witness, according to the record, ever claimed to have seen any such knife, other than appellant.

Appellant, although reputed to be a hard, constant worker, did not go to work on July 8th, 1946, but stayed around home, as stated supra, and between nine and ten o'clock that morning armed himself with the fatal pistol, concealing it in his overalls. He was not well, he explained, and just loafed around the house. However, he decided a few minutes before twelve o'clock, on this particular day, to do without his noon day meal, and go to the mill to gather some blocks for fuel. He left his part of the joint tenement on such an errand, he said, although over the same path he knew Turner would take about the same time, returning from the mill to his portion of the common domicile for his midday meal. Appellant's version was that they met in the cattle gap by mere coincidence. This path was in plain view of the appellant's home as it led from the mill, and the cattle gap was in plain view of the highway in which the wife of deceased tried to flag motorists for help.

So, after having the pistol on his person for about three hours, appellant went upon this journey. He claimed Turner had threatened to kill him, which was his reason for so arming himself. This threat, he said, was made in an overheard conversation between Turner and Turner's wife, wherein deceased menacingly declared, ''I am going to let him down whenever I see him.'' Appellant also swore that Turner had threatened to shoot him through the wall between their abodes.

Appellant said he had started to give himself up, but the sheriff came before this could be accomplished. According to witnesses, appellant was a man of good reputation, while deceased was a man of bad reputation, for peace and violence, in the community where they lived. The jury heard all of the foregoing testimony, and, as stated supra, convicted appellant of manslaughter thereby resolving conflicts, in the evidence, against him.

We are of the opinion that the Court committed no error in its admission of the evidence as to the Jack Burl incident. Clark v. State, 123 Miss. 147, 85 So. 188. Or in permitting the widow of deceased to deny, in rebuttal, appellant's charge that she took away or saw an open knife, from beside her husband after the shooting, even though the rule had been invoked, and while sitting in the courtroom she heard a little of the testimony. This is a matter addressed to the sound discretion of the trial judge, and we find no abuse thereof here.

The appellant was indicted for murder,—he was convicted of manslaughter. He complains that the State was granted the conventional charge on the verdict, permitting his conviction of murder; while he was denied a peremptory instruction of not guilty, and another that the jury ''cannot find the defendant guilty of murder.'' We are of the opinion the Court below was correct in all three instances. However, as to the two instructions dealing particularly with the murder feature, we have declared that where defendant is convicted of manslaugh-

ter on a charge of murder, he cannot complain of the giving of a murder instruction, as he was not prejudiced thereby. Gregory v. State, 152 Miss. 133, 118 So. 906; Carter v. State, 99 Miss. 435, 436, 54 So. 734.

There were no eyewitnesses to the actual shooting, and appellant earnestly and ably argues that his story of it is reasonable and is not inconsistent with physical facts, and, therefore, the jury was bound to accept it. And that he should have been granted a peremptory instruction of acquittal, but failing that, his motion for a new trial on such ground should have been granted. However, the antecedent events and conduct of appellant, beginning with his threat against deceased on July 4th, and his unusual behavior on the morning and at noon just prior to the shooting, and other attendant circumstances, it seems to us, stamp his narrative as unreasonable, especially in view of his conflicting and contradictory statement to the sheriff that he started the renewal of the quarrel with deceased in the cattle gap, and that he saw him to have no gun or knife at the time of the killing. It will be remembered, appellant told the sheriff he said to deceased, in the cattle gap, ''Why don't you do some of that threatening talk in the open, and not do it in the house?'' Turner had said nothing to him there in renewal of the quarrel. Appellant's version on the witness stand was quite different and in contradiction of what the sheriff of the county swore appellant voluntarily told him. We think the jury would have been justified in a verdict of murder, and that appellant was very fortunate when convicted of manslaughter only.

In Bennett v. State, 152 Miss. 728, 120 So. 837, 838, the Court said: ''The killing with a deadly weapon is assumed to be malicious, and therefore murder, and before the presumption disappears the facts of the killing must appear in the evidence and must change the character of the killing, either showing justification or necessity, before it is reduced from murder. If the facts relied upon to change such presumption are unreasonable

and improbable, or if they are contradicted by physical facts and circumstances in evidence, then the jury may find a verdict either of murder or manslaughter, according to the circumstances and facts in evidence. Stubblefield v. State, 142 Miss. 787, 107 So. 663; McFatter v. State, 147 Miss. 133, 113 So. 187; McGehee v. State, 138 Miss. 822, 104 So. 150; Grady v. State, 144 Miss. 778, 110 So. 225; Sullivan v. State, 149 Miss. 412, 115 So. 552; Ivey v. State, [154] Miss. [60,] 119 So. 507." To the same effect is Weathersby v. State, 165 Miss. 207, 147 So. 481.

The judgment of the Circuit Court is, therefore, affirmed, as we find no reversible error in the trial there.

Affirmed.