SALMON *v.* STATE.*

(Division B.   Nov. 5, 1928.)

[118 So. 610.   No. 27467.]

540

*Corpus Juris-Cyc References: Criminal Law, 16CJ, section 2744, p. 1226, n. 18; 17CJ, section 3332, p. 61, n. 77; section 3667, p. 326, n. 80. Homicide, 30CJ, section 476, p. 240, n. 73; section 557, p. 310, n. 25.

*Bratton & Mitchell,* for appellant.

*J. A. Lauderdale,* Assistant Attorney-General, and *Geo. T.* and *Chas. S. Mitchell,* for the state.

Argued orally by *C. A. Bratton,* for appellant, and *J. A. Lauderdale,* Assistant Attorney-General, for appellee.

ANDERSON, J. Appellant was indicted and convicted in the circuit court of Pontotoc county of the murder of Earl Hutchinson. The jury returned a verdict of guilty, but failed to agree as to the punishment, and thereupon the court sentenced appellant to the penitentiary for his natural life. From that judgment, appellant prosecutes this appeal.

The evidence for the state tended to establish the following state of facts:

The homicide took place on June 6, 1925. The deceased, Hutchinson, was a young, unmarried man of twenty-five years of age, and lived at Houlka, in Chickasaw county. The appellant was a married man of thirty-five years of age, having a wife and four children, and lived in the town of Pontotoc. The homicide took place on a Saturday afternoon. On Friday, the day before the homicide, appellant and Mag Smith, together with Letitia Ashley and a man named Mills, had been to a dance at the home

of one McKnight in Pontotoc county. After spending a while at the dance, the four of them returned to Pontotoc. Mag Smith and the appellant occupying one car, and Letitia Ashley and Mills another, drove out on the Pontotoc and Tupelo Highway and there spent the night. Early the next morning appellant and Mag Smith had some kind of misunderstanding. About sunrise on the morning of the day that the homicide occurred, appellant brought Mag Smith and Letitia Ashley back to the town of Pontotoc, and directed Mag Smith to take Letitia Ashley home in his car. The two women then proceeded to the home of Letitia Ashley and from there went to the town of Houlka. After a night's debauch, they wanted whisky, and while at Houlka they saw deceased and asked for some. He told them that he had none, but would try to get some for them, and instructed them to wait for him on a bridge a short distance from Houlka. While waiting for him at the bridge, Hutchinson returned in the car with Edward Brown, bringing a half pint of whisky, which the four of them drank. No more whisky was drunk by these persons that day. After drinking the whiskey, Letitia Ashley got in the car with Edward Brown, and Hutchinson, the deceased, got in the car with Mag Smith, and proceeded to Lochinvar, a place about three miles south of the town of Pontotoc. The appellant, Salmon, was there when they reached the place. After remaining at Lochinvar for a while, all of them left for the town of Pontotoc, the two women and Brown and Hutchinson occupying one car, and appellant the other. After reaching the town of Pontotoc, the two women and Brown and Hutchinson, the deceased, drove through the town and back to a cafe, where they had some cold drinks, and then out on the Pontotoc and Tupelo Highway. Appellant saw them pass through the town of Pontotoc, and shortly afterwards armed himself with a pistol, got in his car with Vern Bishop, and drove to the foot of Gordon Hill, near Lochinvar, where he got a quart of whisky

which he had buried there a few days before. After getting the liquor, appellant returned to Pontotoc and drove out on the Pontotoc and Tupelo Highway in the direction that Mag Smith and the other persons with her had gone, and soon met some of them returning to Pontotoc with Thed Jackson. Immediately after passing appellant's car, Jackson remarked that he wanted to see appellant on some business and turned his car around and followed him. A short distance out of town, appellant parked on the side of the highway. About this time another car, referred to in the evidence as the "Arkansas car," in which a sister of Mag Smith was riding, drove up going toward Pontotoc, and parked in front of appellant's car. When Jackson came up in his car, he parked between the Arkansas car and the car of appellant. Shortly afterwards, Hutchinson, the deceased, and Mag Smith drove up and parked behind the car of the appellant. At this time Mag Smith's sister was in the car with appellant. Upon seeing them, Mag Smith immediately went to the car where they were and took off appellant's hat, tore it up, and threw it on the ground, and cursed him. Thereupon appellant got out of the car told Mag Smith that he was going to whip her. She ran behind Hutchinson, the deceased, and begged him not to let appellant whip her, to which entreaty Hutchinson replied, "Oh, he's not going to whip you." Appellant then remarked, "I am not going to let any son of a bitch run over me," and reached into his car and got his pistol. All those present, including appellant's companion, Vern Bishop, attempted to take the pistol away from him or prevent him from using it, but failed. Freeing himself from those who were trying to prevent him from using his pistol, appellant advanced upon the deceased, who was standing, in his shirt sleeves, with a cigarette between two of fingers of his right hand. Deceased, throwing up his hands and retreating, said to appellant: "Hessick, don't shoot me. I haven't done anything to you. Give me a chance. Don't shoot me." Ap-

pellant still advancing on him fired four shots at him, one of which penetrated the brain of the deceased. Deceased, with the cigarette still between the two fingers of his right hand, fell under a wire fence near the highway. Appellant then went to the prostrate form of the deceased and felt his pulse and turned to those present and said: "I have killed the son of a bitch." He stated further: "We don't know anything about this. Don't know who done it." Appellant then went to his car, and took what remained of the quart of whisky and broke it over the wheel of his car. Shortly after the shooting took place, Dr. Abernethy, who was returning from Tupelo in his car, stopped, and upon being asked to help, went to the body of the deceased and found him lying dead with the cigarette still between the fingers of the right hand. As the doctor turned from the dead body, appellant said, apparently to Mag Smith: "Dry up, you damn bitch! You are the cause of the whole trouble." And she immediately replied: "You are a damn liar. You killed him in cold blood without any cause." Dr. Abernethy then stated to those present that he could not render any help; that they needed a sheriff instead of a doctor; and appellant, in response to his statement, said: "Send all of the damn sheriffs out here; I don't care for them."

Appellant claimed self-defense, and to establish that defense relied alone on his own testimony. He testified that when he shot the deceased, the latter had struck him with a Coca-Cola bottle, and was trying to strike him again, and that deceased had inflicted a serious wound about his neck and shoulder with the bottle. The officers, arriving at the scene shortly after the homicide found Coca-Cola bottles on the highway several feet from where the crime took place. Appellant contends that the evidence was insufficient to sustain the verdict of murder and that under the evidence the verdict of the jury could not have been for a graver offense than that of manslaughter. We have set out rather fully the state's case

as made by the evidence; and we think it is ample to establish the charge of murder against the appellant.

Appellant offered to prove by Mrs. Miller that, shortly before the homicide, deceased, in her presence, threatened to kill him, or do him some great bodily harm. Appellant, however, did not offer to prove by Mrs. Miller that such threats were communicated to him. The court excluded the proposed testimony of Mrs. Miller, to which action of the court appellant objected and now assigns that ruling of the court as reversible error. At the time this testimony was offered, the evidence introduced up to that point showed without conflict, that appellant was the aggressor in the difficulty which resulted in the homicide. Previous uncommunicated threats are not admissible unless there is a conflict in the testimony as to who the aggressor was. *Johnson* v. *State,* 54 Miss. 430; *Guice* v. *State,* 60 Miss. 714; *Hawthorne* v. *State,* 61 Miss. 749; *Johnson* v. *State,* 66 Miss. 189, 5 So. 95. After Mrs. Miller's proposed testimony was excluded, appellant went upon the witness stand and testified, in his own behalf, that the deceased was the aggressor in the difficulty. Thereafter the court permitted the appellant to prove certain threats the deceased made against him; but appellant, after raising the question as to who was the aggressor, by his own evidence (which was all the evidence in the case tending to show that the deceased was the aggressor) failed to reoffer Mrs. Miller to prove the threats made against him by the deceased. We are of the opinion that the court committed no error in excluding the proposed testimony of Mrs. Miller at the time it was offered.

Appellee introduced Sid Hataway, whom, over appellant's objection, the court permitted to testify, in part, as follows:

"Q. Mr. Hataway, do you remember the occasion or the time when it is said Mr. Earl Hutchinson was killed out here by Mr. Hessick Salmon? A. Yes, sir. Q. Were you in the Town of Pontotoc that day? A. Yes, sir. Q. Did

you see Mr. Salmon that day? A. Yes, sir. Q. About what time of day, please, sir? A. I met him right down here about just about—well, let's see—it was right about the front of where Mister—that fellow that's got his beef market there? Q. What fellow? Mr. Grill? A. Grill. Q. That is in front of the Rowe Produce? A. Yes, sir. Q. Did you have a conversation with him there? A. Yes, sir. Q. What were you talking to him about? A. About some beef. Q. Go ahead and tell the conversation you had with him. A. You want me to tell what started it up? Q. What brought up the conversation. A. Well, I had sold his wife some beef that morning; fifty cents worth of beef; and she just asked me, said, 'Mr. Hataway, if you don't mind it, get Hessick to pay you; collect it from Hessick?' and I said, 'No, 'm, I don't mind it a bit in the world.' So I went on and I had been down there about Joe Smith's to collect some more. Q. You needn't tell about that. A. Anyhow, I was going up the street and I saw Hessick going down that way in his car and I throwed up my hand and I walked up and told him my business, and I said 'Hessick, I sold your wife some beef and she told me if I saw you to collect the money from you'; and he looked straight at me and said, 'my wife?' and I said, 'Yes, sir,' and he said 'You're mistaken, my friend, I ain't got no God-damn wife; you're mistaken about that'; and I said, 'Hessick, well, I'm just telling you what she said'; and he started just like he was going to start his car on, and he just checked up and said, 'Mr. Hataway' or 'my friend'; I forget which it was; 'Hate for you to be beat out of your money,' but, says, 'if you don't get beat out of your beef you'll have to go up there and tell that God-damn woman to pay you; I'm not'; and I said, 'All right, Hessick.' That's all I know about it. Q. What time did you say that was? A. Somewhere, best of my recollection, three or three thirty; somewhere about that. Q. Anybody in the car with him? A. No, sir, not then. Q. What was his condition with reference to being drunk

and sober? A. Well, he was, I thought a drunk man. Q. Did you see anything of a pistol there in the car with him? A. Well, I saw something there that looked like a pistol. Mr. Adams: That is all. Mr. Bratton: Now, if the court please, we have no objection to the witness testifying that he saw Mr. Salmon about that time and that Mr. Salmon was drunk or drinking, whatever he wants to say about it, and that he saw something in the car that looked like a pistol; but as to the balance of this conversation in reference to what he said about his wife, we object to that on the ground that it is immaterial and irrelevant and does not throw any light on the issue.''

It will be observed that in objecting to the testimony of this witness, appellant's attorney stated to the court that the objection was directed to only that part of the testimony of the witness relating to what appellant said about his wife; that appellant conceded that the balance of his testimony, tending to show that he was drunk and armed, was admissible. We think the court erred in admitting this evidence, but that the error was harmless for these reasons; that appellant was given an instruction in the following language:

''The court further instructs the jury for the defendant, that the testimony of the witness, Sid Hataway, was admitted solely for the purpose of throwing light on the question as to whether or not the defendant had a pistol, and whether or not he was drunk at the time of the difficulty. And he now says to you positively that you shall not consider the remark testified by Sid Hataway with reference to his wife in determining the question of guilt or innocence of defendant on this charge, only for the purpose above stated.''

And furthermore although that part of the evidence admitted over appellant's objection tended to show appellant's extreme moral depravity which ordinarily would have been harmful, still it could not have injured his case because that fact was demonstrated by other uncontra-

dicted evidence. That fact, we think, taken in connection with the above instruction given appellant, nullified the error in the admission of the testimony of the witness Hataway.

Appellant assigns as a ground for his motion for a new trial that Lawrence Collins, one of the jurors, who tried his case, was incompetent as a juror, because he had prejudged the case against appellant, and had so expressed himself before being accepted as a juror. A new trial should not be granted on the ground of the disqualification of a juror unless supported by the affidavit of both the defendant and each of his attorneys that each of them was ignorant of the juror's incompetency when he was accepted, or unless each of them so testifies on the motion for a new trial. This was not done. The court committed no error, therefore, in overruling the motion for a new trial based upon that ground. *Brown* v. *State,* 60 Miss. 447; *Harris* v. *State,* 61 Miss. 304.

Another ground assigned in the motion for a new trial was that the jury had access to, and was permitted to read, an editorial published in the Commercial Appeal of the date of April 26, 1928. A. M. Mitchell, one of the appellant's attorneys, testified that appellant's attorneys knew that the jury had the paper in question in its possession; and that this was known to them before any testimony was introduced in the case, and that they did not inform the court that the jury had the newspaper, but called the attention of the circuit clerk to the fact. Nor did appellant make any objection to the jury trying the case after they had read the paper, if, in fact, they did read it. It was shown that there was nothing in the newspaper referring specifically to this particular case. Conceding, although it was not shown by the evidence, that it was prejudicial to the appellant for the jury to read the newspaper in question, and that they did read it, still appellant had no ground of complaint, for he made no objection to the action of the jury in that respect. He

failed to call on the court for a ruling. If harm was done the appellant by-the occurrence, the blame was on him and not on the court.

*Affirmed.*

*Corpus Juris-Cyc References: Criminal Law, 17CJ, section 331, p. 59, n. 46.