HENDRIX *v.* STATE.

(Division B.   May 6, 1935.)

[161 So. 151.   No. 31425.]

Rush H. Knox, of Jackson, for appellant.

**Wm. H. Maynard,** Assistant Attorney-General, for the state.

Argued orally by **Rush H. Knox**, for appellant, and by **Wm. H. Maynard**, for the state.

**Griffith, J.**, delivered the opinion of the court.

Appellant, the defendant, was indicted for murder, and on the trial was convicted of manslaughter. He assigns as error, among other assignments, that the court excluded from the jury much of the material evidence offered by defendant of previous threats and assaults and other hostile maneuvers by deceased against the defendant, all unprovoked by the defendant.

In reviewing that assignment we must take the case as made by the undisputed proof, plus the evidence introduced by the defendant, plus the evidence offered by the defendant but excluded by the court. The case thus considered is this:

There had been an enmity on the part of the deceased towards the defendant for some months, the exact time not being disclosed by the record, characterized by wanton insults, abuses, and assaults by deceased upon the defendant. For instance, on one occasion some time before the homicide, the deceased had taken some money from the defendant in a neighborhood store, and upon protests by the defendant, the deceased kicked him around, stating at the time that if the defendant did not like it he would kill him. About two weeks before the homicide, the defendant had informed the officers that the deceased was in possession of intoxicating liquors, which the officers destroyed. When the deceased learned of the defendant's part in this matter, the deceased met him in Paine's store, and cursed him most bitterly and uttered the most vicious threats against him. In the early afternoon of the day before the killing the defendant went to the light plant which was being operated by the deceased to see a negro there employed, and the deceased repeated his abuses and threats, and, with a knife, ran the defendant away. Some short time thereafter, and on the same afternoon, the deceased, with a shotgun, appeared in the village to which defendant had gone, and the deceased inquired at Stevenson's filling

station, which defendant sometimes visited, whether the defendant had been there, and being informed that defendant had gone up the street deceased followed in that direction. The defendant had gone into Wofford's store, and soon the information came to those therein that the deceased was in pursuit of the defendant and was armed with a shotgun, and the storekeeper hid the defendant. In a short while the deceased came into the store inquiring for the defendant, and the storekeeper contrived to persuade the deceased to leave. In about fifteen minutes the defendant came out of his hiding place and started to Crawford's store, when he discovered that the deceased was following him. The deceased called to the defendant to stop, but the defendant failed to stop, whereupon the deceased shouted to him: "You red-necked son of a bitch, I will kill you before Saturday night." The defendant succeeded in getting into Crawford's store, which apparently was a place friendly to the defendant, and the deceased, after passing there in a threatening manner, temporarily departed. At Crawford's store the defendant saw a shotgun, which he procured that night after the pool room incident, hereafter to be mentioned. During the course of the same afternoon, a neighbor named Darby saw the deceased and undertook to persuade him to drop the trouble, whereupon the deceased pronounced curses against the defendant, charged him with larceny, and declared that he was determined to stop him.

That night the defendant and several others were playing pool in a pool room in the village, when suddenly the deceased appeared with a shotgun which he drew on the defendant telling him to get out into the street, that he expected to kill him when he reached the street, and by punching the defendant in the back with the gun he drove the defendant to the door, when the defendant ran and escaped, followed by the same character of threats

of death which the deceased had continuously before been uttering. The defendant then went to the store and procured the shotgun mentioned in the next preceding paragraph.

On the following morning defendant bought some shells for the gun, and, armed with it, he went to a filling station to catch a conveyance to go to the county seat to see the sheriff to seek some sort of protection. After waiting there awhile and failing to see a conveyance going to the courthouse town, he went across the street to Darby's store, where he was told by a messenger from the mayor that the deceased had just been interviewed by the mayor and had promised the mayor that he would cease his conduct towards the defendant and would drop the matter. The defendant thereupon took the shotgun and started to Crawford's store, from which he had taken the gun, in order to return it.

As the defendant was proceeding down the street towards the store last mentioned, and on the same side of the street with the store, he saw the deceased and a brother of the deceased standing at the intersection of the streets not far from the store. As defendant neared the store the deceased and his brother approached him, and when they had approached within a few feet of him, he stopped and ordered the deceased to stop, remarking to the deceased and his brother, "Boys, I have done run from you all long enough and will not go backward another step;" to which the deceased replied, "You will run or I will kill you," and the deceased and his brother continued to advance in a threatening manner, whereupon when they had arrived within eight or ten feet from the defendant, he shot and killed the deceased, and the brother of deceased immediately abandoned the encounter.

In view particularly of the assurance given by the deceased on that morning to the mayor, which information had been communicated to the defendant a few minutes

before the homicide, to the effect that the deceased would cease his pursuit of, and change his attitude towards, the defendant, it was of vital importance, in justice to the defendant, that all the facts above set forth and which were either produced in evidence or offered to be proved by the defendant should be allowed to be fully shown by him. If the court had so fully allowed, the jury would have been justified in concluding that the assurance given by the deceased to the mayor was not given in good faith, that the deceased had not in actual fact abandoned his previous attitude and disposition, and that his purpose in company with his brother, in approaching the defendant on the immediate occasion of the homicide, was to get close enough to the defendant to take the gun away from the defendant, and thereupon to carry out his previous deadly maneuvers and threats. Or if the jury did not so conclude, then they might well have concluded, putting themselves in the place of the defendant, that the defendant, in view of all that had previously transpired, was well justified in anticipating, and in acting upon the anticipation, that the actual attitude and purpose of the deceased, so accompanied, was as last above stated.

But the court refused to admit in evidence before the jury all the threats and previous manifestations of hostility by the deceased against the defendant, and, by its rulings, literally cut to pieces the evidence offered by the defendant of those matters, and while admitting some of them excluded others of distinctly material important. It has long been settled in this state, and we quote here from Brown v. State, 88 Miss. 166, 171, 172, 40 So. 737, "that wherever there is doubt, confusion, dispute, or conflict as to the origin of the difficulty, or as to who was the aggressor in the difficulty, which resulted in the death, and when such fact is the pivotal one in the case, testimony of uncommunicated threats, and the

nature and character of previous difficulties, wantonly provoked by the deceased, is always admissible, provided the testimony shows some overt act on the part of the deceased at the time of the fatal encounter. . . . We would reverse the case upon this ground alone, even if it were the sole error in the record. Courts should not attempt to whittle away the rights of defendants upon trial for their lives. Every ruling should resolve any doubt in favor of the accused.''

It is no sufficient compliance with the above rule that some of the threats or some of the previous hostile maneuvers by the deceased shall be allowed to be shown; but all of them should be received, especially in a case such as this, where there has been a recent declaration of reformation by the deceased, and it becomes therefore a material point for decision whether that declaration was in good faith, and whether the defendant would be justified in disbelief of the good faith thereof. And in such a case evidence of impositions upon and open hostility towards the defendant by the deceased going back over a continuous course, although of considerable time, would be admissible as logically and rationally pertinent to the inquiry whether an enmity and hostile purpose so long and so persistently maintained and openly demonstrated by the deceased would probably be, in the light of human experience and observation, so suddenly abandoned, as was asserted as a material part of the state's case here. 6 Ency. Ev., p. 646; 30 C. J., p. 197, sec. 425; 2 Wharton Crim. Ev. (10 Ed.), p. 1726.

Reversed and remanded.