## Self *v.* State.

(Division A.   May 3, 1937.)

[174 So. 44.   No. 32749.]

Marshall **T. Adams**, of Tupelo, for appellant.

**W. D. Conn, Jr.,** Assistant Attorney-General, for the State.

**McGowen, J.**, delivered the opinion of the court.

On the afternoon of August 17, 1936, the appellant, Tom Self, aged 66 years, stabbed and killed J. E. Knox with a knife. On an indictment for murder, Self was convicted, by a jury which fixed its verdict at life imprisonment, from which this appeal is prosecuted.

The appellant argues two assignments of error, first, that the court erred in admitting the testimony on behalf of the State, over the objection of appellant, of J. H. Johnson, and second, that the court erred in admitting the testimony on behalf of the State, over the objection of appellant, of Word Smith. We will not undertake to detail all of the facts, but only such as are sufficient to develop the points raised by these assignments of error.

J. E. Knox had been for sometime and was then the welfare agent of Pontotoc county, having an office in the courthouse where he was killed.

His wounds, as described by a physician, were a ''deep combination cut and stab wound at the upper pole of the left lung approximately four inches long, penetrating to the cavity of the lung, another combination stab wound at the level of the ninth rib on the left side approximately eight inches long, also penetrating the lung. A cut stab wound of the left upper abdomen that penetrated. He had an indeterminable number of superficial wounds about the body, face and upper extremities. . . . Had a pretty severe cut on his left thumb, a smaller one, as I recall, on his left small finger.'' This physician further described the condition of Knox by saying, ''Mr. Knox was holding a bowel protrusion to the extent of a large grapefruit, and that had protruded from the abdominal wound.'' Knox died from these wounds, at the Pontotoc Clinic, about six hours later.

The main evidence on behalf of the State was to the effect, as testified to by Mrs. M. J. Biffle, who was an employee in the office conducted by Knox, that she was

present at the time of the killing; that the office handled pension checks and certified people to be entitled to commodities and clothing; that appellant had been dropped from the roll about June 1st, when he came to the office at 9 a. m. on August 17th, and had some conversation with J. E. Knox; that Self returned to the office about 10 or 15 minutes after 5 that afternoon, and there were three men in the office at the time. Mrs. Biffle testified that these three parties retired as Self came in, and the door was shut; that Self and Knox engaged in a conversation to which she did not pay any attention as she was winding up the day's business and preparing to close the office, but she heard Self call Knox a ''low down rascal'' two or three times, but could not detail their conversation. She also heard Knox, in a nervous voice, say, ''Self, it seems you came to this office this afternoon to fight it out,'' to which Self replied, ''I did,'' and she heard a blow, and then heard Self say, ''I did and now is as good a time as any;'' that Self seemed to be hitting Knox rapidly, and ''at the bat of your eye,'' he had a knife in his hand and began cutting Knox. She testified that she ran out of the office and called the sheriff, and when she returned she heard Knox say, ''Self, you have done enough with your knife, put that down,'' and that Self then stabbed him again, and then walked out as calm as if nothing had happened.

J. H. Johnson testified that during that afternoon, before the killing, he, with the appellant, was sitting on a bench outside the welfare office, and he said to appellant, ''Mr. Self you getting your pension now,'' to which he replied, ''No, but I am going to have it;'' that Self showed him his pocket in which was an open knife, but that the witness saw only the blade thereof which appeared to be long; that immediately after showing Johnson the knife, Self pointed to an old lady and said, ''Just such as that is the reason we can't get any pension.'' Witness said that Self looked like he was mad.

Word Smith testified that about 30 or 40 minutes be-

fore the killing, he had a conversation with Self in which he remarked about the crowd and said that Knox had a "few pets who were getting all the stuff," and that "There's going to be bloodshed over it."

The evidence of Johnson and Smith was admitted, over the objection of appellant, and he assigns this as error.

In his own behalf, after testifying as to several visits to the office of Knox, and how he was dressed, appellant stated that on the occasion of the killing he entered the office of Knox accompanied by Preston Wright; that appellant spoke to Knox about getting help, and that Knox said to him, "If you are up here to make me do something, you are far from it," to which Self replied that he was there on Saturday and that day, stating that, "We have run around here after these grand rascal tickets until I am tired of running about these grand rascal tickets;" that Knox asked if he meant to call Knox a grand rascal, saying "I will slap your head off;" that Self said, "I didn't call you a grand rascal;" that about that time Knox "popped me with his right hand and I lost my pipe and glasses; then he popped me again on the other side of the face, and while I was addled and all, he got me in the collar, got me in the throat . . . his left hand in my collar;" that he then put his hand in his pocket, got his knife, which he opened with his teeth, and because his breath was being cut off and he was seeing stars, he began to cut Knox. Self stated that when he got loose from Knox, he picked up his hat and walking stick and walked out. He had two knives when he was arrested a short time later. He denied the conversations attributed to him by Johnson and Smith.

A witness testified that appellant had some bruises and abrasions on his face.

R. C. Westmoreland testified that he had gone to the office of Knox to get an order for commodities and clothing, and that Mrs. Biffle came running out saying that

Self was cutting Knox; that he went to the door and saw Knox holding Self by the throat and hitting him, and that appellant struck Knox with a knife. There was evidence tending to contradict this witness.

This statement of the evidence reflects that there was conflict as to who was the aggressor in the difficulty.

The evidence of Johnson and Smith shows that Self was in an ugly mood, as shown by the display of his knife, and his saying there was going to be bloodshed, and that he thought Knox had pets.

Appellant cites the case of Salmon v. State, 151 Miss. 539, 118 So. 610, wherein this court held that in a prosecution for murder, error in admitting evidence relative to conversation wherein defendant's statements concerning his wife tended to show extreme moral depravity on his part were held harmless. The statement there under discussion was not made just before the homicide occurred, nor did it seem to refer to the deceased. The following cases were there cited: Johnson v. State, 54 Miss. 430; Guice v. State, 60 Miss. 714; Hawthorne v. State, 61 Miss. 749; and Johnson v. State, 66 Miss. 189, 5 So. 95. The appellant also cites Underhill's Criminal Evidence (3 Ed.), p. 732, wherein it is said, "Under certain circumstances the vague and uncertain threats of the accused may be shown to prove the condition of his mind at the time of the crime. This rule is applied to his declarations that he is going to kill somebody, without mentioning any names, or that he is going to make trouble, or that he is going to shoot someone, or similar indefinite threats which indicate that he is in an ugly frame of mind and disposed to commit some crime, though not the particular crime for which he is on trial. When, however, it clearly appears that the accused and the deceased were acquainted and had always been friends down to the homicide, general threats by the accused are incompetent."

We think that, even under the quoted authorities, the general, vague statements attributed to the appellant

tended to show his frame of mind toward Knox. He was resentful of the fact that others were obtaining relief, and thought that Knox had favorites, and this evidence is of statements so close to the tragedy as to shed light upon the difficulty, and to show that appellant held malice toward the deceased. Johnson v. State, 85 Miss. 572, 37 So. 926; Price v. State, 36 Miss. 531, 72 Am. Dec. 195, and especially the cases of Story v. State, 68 Miss. 609, 10 So. 47; Brown v. State, 98 Miss. 786, 54 So. 305, 34 L. R. A. (N. S.) 811; Huddleston v. State, 134 Miss. 382, 98 So. 839; Spivey v. State, 58 Miss. 858; McCormick v. State, 159 Miss. 610, 132 So. 757; Cartee v. State, 162 Miss. 263, 139 So. 618; Dixon v. State, 169 Miss. 876, 154 So. 290; Clark v. State, 123 Miss. 147, 85 So. 188, 190, and Hendrix v. State, 172 Miss. 589, 161 So. 151. In the Clark Case, supra, this court said that,

"The evidence as to who was the aggressor in the fatal encounter, on the solution of which the guilt or innocence of the appellant depends, being in irreconcilable conflict, the state of mind of each of the participants therein toward the other was a material inquiry, and any evidence pertaining thereto was relevant and, unless incompetent on some other ground, should have been admitted. 'The law furnishes no test of relevancy. Unless settled by statute or controlling precedent, relevancy is to be determined by logic, being the application of the principles of reason, judgment, and systematic arrangement to the matter in hand. All facts which tend either to sustain or to impeach a logically pertinent hypothesis are admissible. But no facts are relevant which do not afford a reasonable presumption or inference as to the principal fact in issue, or which do not make more or less probable such a hypothesis.' I Wharton's Criminal Evidence, section 24; 11 Ency. of Evidence, 174."

The statements testified about in the case at bar were made such a short time before the homicide, and the language used, tend to show directly that Self referred to Knox.

Under such circumstances, we think the evidence tended to shed light on the issue as to who was the aggressor in this difficulty, and we think the evidence was admissible as showing the appellant's malicious purpose, even if we assume that the threats and statements were general, and, to some extent, impersonal, and that such evidence was competent.

At the instance of the appellant, the court below gave an instruction which permitted the jury, if they saw proper, to convict the appellant of manslaughter.

We do not think the verdict in this case should be disturbed, as we find no reversible error in the record.

Affirmed.