EATON *v.* STATE.

(In Banc. Dec. 9, 1946.)

[28 So. (2d) 230. No. 36249.]

730

**Cunningham & Cunningham** and **E. K. Windham**, all of Booneville, for appellant.

**Greek L. Rice,** Attorney General, by **R. O. Arrington,** Assistant Attorney General, for appellee.

**L. A. Smith, Sr., J.,** delivered the opinion of the court.

Appellant was convicted of the murder of Dalton Wren. The jury was unable to agree upon the punishment, and accordingly he was sentenced to imprisonment for life in the penitentiary.

Dalton Wren married the daughter of the appellant, and to this union were born two children, quite young at the time of the slaying. They lived about ten miles in the country from Booneville, while appellant's home was on the outskirts of that city. During the latter part of September 1945, while her father and mother were absent in another city, appellant's daughter, with the two children, came to the home of her father with her face beaten and bruised, and the parents on their return found them there. The State, in its brief, says about it: "Evidently a temporary separation from her husband, the deceased,

which from all of the evidence was the cause of the killing.''

About ten days later, responding to urgency of the husband, which the wife tried to say was in part in the form of threats to take one of the children away from her if she did not, appellant's daughter returned to her husband, the deceased. Quoting further from the State's brief, we find that: ''While they were separated, the evidence shows that the deceased threatened the life of appellant, committing many acts of violence against him, and on several occasions using abuse and insulting language while talking to his father-in-law, the appellant.'' Appellant told his son-in-law to stay away from his home.

On October 22, 1945, the deceased brought his wife and children to town in a school truck. The daughter asked her husband to put her and the children out at the corner near her father's home instead of in front of his gate in order to avert trouble between her husband and father, and to call for her at the same corner in the afternoon when he was ready to return home. The appellant was uptown the morning of the trouble, and seeing his son-in-law upon the street returned home, seeking to avoid having any trouble with him.

Mrs. Wren and the two children were at her father's home that afternoon when her husband came by to pick them up. Instead of stopping at the corner, as she had requested him to do, the son-in-law drove up in front of the gate of appellant and parked there, staying in the truck. With him were two neighbors and his own father, two of whom dismounted from the truck. Someone in the house exclaimed, ''Here is Dalton.'' Appellant immediately went to the living room of his home, obtained a pistol he kept there, stuck it into the belt of his overalls, and went down the steps part of the way toward the truck. He said to his son-in-law: ''Dalton, I have asked you not to stop in front of my house anymore;'' and, according to appellant's testimony, the son-in-law retorted: ''Well, I am here, and what in the hell are you going to do about

it," at the same time reaching into the bib of his overalls for a pistol, appellant feared. Appellant then pulled his pistol and shot deceased in what he considered his necessary self-defense. The father of deceased testified he never saw the pistol until appellant raised it to shoot, "about that time," that is, the end of the above colloquy.

The father of the victim had gone into the house for one of the children. The wife of deceased had gotten the baby, and was sitting in the truck with it at the time of the shooting. The father of the deceased was between the porch and the street. He was looking at appellant when he fired the shot, and hence did not see what his son was doing. The wife testified that she could see her husband's left hand on the steering wheel but could not see his right hand, and did not know what he was doing with it. The friend who had gotten out of the truck into the street said he had his back turned to the son-in-law, watching the father-in-law, and hence did not know what the former was doing at the time of the shooting. The other passenger in the truck testified that he could see the head and left hand of the son-in-law but could not see what he was doing, if anything, with his right hand.

This one shot killed the son-in-law. The wife testified that he owned no pistol, and the undertaker testified that in removing the body he did not feel any pistol, but made no search for it. Appellant testified that he thought his son-in-law was "going for his gun." He had reason to apprehend that this was true, and that his son-in-law carried a pistol in the bib of his overalls, because of an experience he had had with the deceased at a barber shop in the City of Booneville shortly prior to the killing. On that occasion, while appellant was in the barber shop, his son-in-law entered, called him to the back and commenced cursing him about taking his wife and children away from him. Appellant assured him that he had nothing to do with it, and asked him to leave and let him alone. Appellant started back to the front of the shop when the deceased jerked him back and put his hand down in the

bib of his overalls and pulled out a gun so that the appellant saw the handle and hammer of it, and applied an obscene epithet to him. There was corroboration of this episode at the barber shop.

However, when appellant undertook to lay the predicate for this corroboration, in answer to the question "Were people hearing it?" he replied "Yes, a fellow got up and tried to stop it, and he stepped back and jerked his hand to bib to says 'What in the hell have you got to do with it?' " The court sustained the objection of the district attorney to this testimony, although without objection the next question and answer that the man was seeking to prevent the son-in-law from pursuing appellant was admitted.

The evidence offered of appeals to the sheriff and mayor for protection of the law, and refused admission by the trial court, was incompetent, and the court was correct in excluding it. Brice v. State, 167 Miss. 255, 148 So. 348.

A witness in the case approached the deceased in connection with the trouble between him and appellant. In the conversation, deceased said: "that there wasn't any way to settle this trouble and there wasn't anything I could say to him to change his feeling." The court sustained the objection of the district attorney to this testimony.

In the same conversation, this witness testified, referring to the son-in-law: "He just said Plato had told him to stay away from his house, but said he wasn't afraid to go out there, wasn't afraid to go in the house if necessary, that he wouldn't do a damn thing, says 'I have done tried him out and know he ain't going to do anything.' " The court sustained the district attorney's objection and said to the jury: "Gentlemen, you won't pay any attention to this last conversation, there is not a semblance of a threat in it." Another witness stated that he was hailed by the deceased on one occasion, as he was driving by, whereupon he stopped, and deceased asked the witness for some cartridges, "I said for a rifle or pistol?" and he said "a pistol," and I said "No, you are

not going to kill anybody are?'' and he said ''I might.''
The witness was then asked ''How long was that before
he was shot?'' and he replied ''Some time during the
same afternoon.'' The court sustained the objection of
the district attorney, stating to the jury: ''You won't con-
sider testimony relative to that supposed threat.'' An-
other witness stated shortly after the separation of the
wife from her husband, when she took refuge at her
father's home, that the deceased was looking for her and
appellant's wife, when the son-in-law said to the witness:
''there wasn't a damn thing'' to appellant, and upon his
being cautioned not go to appellant's home any more, the
son-in-law replied that ''he wasn't afraid to go to the
house and dig him out.'' On the objection of the district
attorney, the court sustained the objection to this
testimony.

Before the wife returned to her husband, she and her
mother, and a negro servant, were driven to the home of
deceased by a witness, Mr. Stoop, in the truck of the wit-
ness. The deceased ordered them all away, and shot at
the feet of the negro. Although this evidence was rele-
vant as to deceased's state of mind in the series of events
leading to his death, the court excluded it.

The record reflects that the district attorney, in his zeal
on behalf of the State, was seeking to establish that ap-
pellant's daughter returned to her husband voluntarily
and lived with him willingly after the separation, and
succeeded in having the trial judge refuse to permit the
daughter to tell why she went back to her husband. Ap-
pellant attempted to testify that she did so because the
deceased threatened to take her baby from her. The
court refused to permit this testimony.

It will be seen from the above cited excerpts from the
record that the defense of the appellant was whittled
down by the trial court practically to the things done at
the time and scene of the homicide, with the effect that
the jury were not even allowed to consider relevant and
pertinent testimony sustaining the theory of appellant

that he acted in what he reasonably apprehended to be his necessary self-defense. It must be remembered that his thinking and acting on that occasion are not to be judged in the same calm, cool deliberation that the jury, or we ourselves, could bring to bear upon the situation. Rather, his thinking and acting must be considered in the light of all the evidence to the extent of putting the trier of fact in the place of the appellant to determine whether or not he had a reasonable apprehension of imminent danger, real or apparent, to his life and limb. With only a part of the story before the jury, it was impossible for it to do this. It is not sufficient to say these exclusions were harmless, because some threats were admitted in the evidence.

Law writers discuss the admission of communicated and uncommunicated threats, admitting the former as a warning and a permit to the one threatened with attack to be on his guard; and admitting the latter in order to show the state of mind of the deceased on the issue of which party was the aggressor. In final analysis it gets down to the ultimate question of which party was the aggressor, and this is not to be determined from the res gestae of the actual fatal encounter only. It also largely depends for correct solution upon the proof of the state of mind of the victim of the final encounter. This being so, proof of the conduct and statements of deceased not being of themselves actual vocal threats, but, which considered along with all the other evidence in the case, demonstrate a positive and definite menace against the life of the slayer, should by courts be considered as revealing state of mind in determining who was the aggressor. Here, the record contains many statements by deceased, which, while not actually proclaiming positive threat, nevertheless are potent with menace, and bitter hatred, and intention of bodily harm to appellant. They, connected with threats, and demonstrations at the barber shop, involving a pistol in the bib of the overalls of deceased there, connected with the apparent overt act of drawing the same pistol by deceased at the scene of the killing, and the

provocative simultaneous taunt of appellant by deceased, "What are you going to do about it?" should all be permitted to go the jury in the interest of a fair trial.

It might be said that since some of this beneficial testimony offered on behalf of appellant and excluded by the court was heard by the jury, and having entered their minds they could or would not exclude it, appellant was not harmed by the action of the court in technically excluding it. A realist will reply, if that be true as to the evidence offered by the appellant, it will be equally true as to prejudicial evidence offered by the State, admitted and later excluded. When, therefore, the court permitted the diligent district attorney, groping for a motive to offset appellant's plea of self-defense, to get before the jury the suggestion that appellant shot his son-in-law because of some improper conduct of appellant with another woman than his wife, it will not do to say that later he excluded it and admonished the jury not to consider it. According to the apologists for disregarding the action of the court as to the first category, the jury had gotten it into their minds, and could or would not exclude it. This was exceedingly improper and prejudicial evidence, wholly incompetent and irrelevant.

With reference to the effect of the admission and exclusion of evidence heard by the jury, we are led to consider the following questions and answers on the cross-examination of appellant by the district attorney:

"Q. You haven't told the jury the trouble between you and your son-in-law. A. Yes.

"Q. Don't you know that's not the trouble? A. Yes, that's all I know he had against me and I didn't have anything to do with that. (The separation of his wife from the son-in-law.)

"Q. Don't you know you fell out with your son-in-law when he took your wife's part when you and she busted up over this woman that worked down here in the sheriff's office?" Defendant's objection was overruled.

"Q. Don't you know that's what happened? A. No, sir.

"Q. You and your wife did bust up?"

Defendant objected to the last two questions that were asked about this man and his wife, and the court asked the jury "not to consider that in passing upon this case." The motion for a mistrial of the case was overruled. The effect of the admission of this evidence by the court, although subsequently excluded, must have left in the minds of the jurors its inevitable poisonous implication in making up their verdict.

In the sixth syllabus of Warren v. State, 174 Miss. 63, 164 So. 234, it is said: "Admission of testimony of constable as to incriminating articles found by constable on defendant's premises without search warrant under reserved rulings held error, requiring reversal, notwithstanding that testimony was subsequently excluded and jury instructed not to consider it." Here, we think the reason of that ruling applies, and that the court should have sustained the defendant's objection to the testimony when first offered instead of admitting it, and thereby enabling it to become fixed in the minds of the jury by further questions regarding it, and then attempting to erase it by a request of the jury not to consider it.

This Court said in Brown v. State, 88 Miss. 166, 40 So. 737: "Wherever there is doubt, confusion, dispute, or conflict as to the origin of the difficulty, or as to who was the aggressor in the difficulty, which resulted in the death, and when such fact is the pivotal one in the case, testimony of uncommunicated threats, and the nature and character of previous difficulties, wantonly provoked by the deceased, is always admissible, provided the testimony shows some overt act on the part of the deceased at the time of the fatal encounter." There was proof in the instant record of this overt act at the time of the encounter.

In Hendrix v. State, 172 Miss. 589, 161 So. 151, 152, the deceased had, as in this case, without justification wanton-

ly insulted, abused and assaulted the defendant over a period of time prior to the fatal encounter. In the case at bar, all of the time that deceased was accusing appellant of seeking to cause a separation of his wife from him, he knew that he himself had driven her from his own home by beating her and bruising her face, and that the appellant was not responsible for the separation, used by him as a pretext for his aggressive persecuting and menacing his father-in-law. In the Hendrix case, as in this case also, the trial court refused to permit evidence on behalf of the defendant of previous threats and other hostile conduct, and statements by the deceased, all unprovoked by the defendant. The Court said in the Hendrix case that the trial court ". . . by its rulings, literally cut to pieces the evidence offered by the defendant of those matters, and while admitting some of them excluded others of distinctly material importance." Yet, referring to the doctrine of the Brown case, supra, in the Hendrix case the Court said: "It is no sufficient compliance with the above rule that some of the threats or some of the previous hostile maneuvers by the deceased shall be allowed to be shown; but all of them should be received . . ."

In the case of Self v. State, 178 Miss. 560, 174 So. 44, 46, quoting from the case of Clark v. State, 123 Miss. 147, 85 So. 188, it was said: "The evidence as to who was the aggressor in the fatal encounter, on the solution of which the guilt or innocence of the appellant depends, being in irreconcilable conflict, the state of mind of each of the participants therein toward the other was a material inquiry, and any evidence pertaining thereto was relevant and, unless incompetent on some other ground, should have been admitted."

We are therefore of the opinion that while this case is not reversible on any one of the actions of the learned trial court alone, yet when the court whittled the defense down so largely and refused to hear appellant's evidence in accordance with the rules announced in the Brown,

Hendrix and Self cases, reversible prejudicial error was committed against appellant. The aggregate of the manifold errors denied appellant a fair trial, and the judgment should be reversed and remanded, in our opinion, as a consequence, as stated, supra.

This brings us to the special bill of exceptions in connection with the closing argument of the district attorney, wherein it was said: "After the reading of the instructions of the court argument of counsel for the State and defendant was heard, and the District Attorney in his closing argument to the jury stated to the jury that every man who was brought into court and who plead not guilty was going to make some kind of a defense, and if this defendant can come into court and bring some of his kinfolk and a bunch of bootleggers to testify for him—at which point counsel for defendant objected in open court to this argument, which objection was by the court sustained, and whereupon counsel for defendant moved the court to enter a mistrial in said cause because of such statements of the District Attorney and the highly prejudicial effect of the same on the jury, which motion was by the court overruled. Whereupon the court immediately and expressly directed the jury to disregard and pay no attention whatsoever to this remark of the District Attorney." The court failed, however, to call attention of the jury to the fact that there was no testimony in the case that any bootleggers testified on behalf of the defendant, or that all of the witnesses for defendant were either kinspeople or bootleggers.

When the very earnest and able district attorney, in his zeal, in the dangerous final argument to the jury, charged in effect that the witnesses of appellant were all kinfolk or bootleggers, this statement, coming from a prominent official as it did, conceivably stayed in the minds of the jurors, and added to all the other matters discussed, supra, could have swayed them, even though the court admonished them not to consider it. The court did not go further and call the attention of the jurors

to the complete absence of any evidence on which to bar this inclusion in the argument of the district attorney. The district attorney occupies a place of power and prestige equal to that of the judge in the trial of criminal cases, to many people, both being elected by popular vote, and the jury's mental allegiance to one or the other in such instances cannot be definitely fixed by a court of review. So, the remark being unsupported by any evidence, and highly prejudicial, simple justice requires that appellant be given another trial with this damaging suggestion totally absent.

The State argues that the admonition of the court to the jury to disregard the matter, of which the complaint was made, was sufficient to cure the improper conduct. Thomas v. State, 200 Miss. 220, 26 So. (2d) 469. The circumstances and basis of argument in that case were wholly different from the situation in this case. The appellant, in answer, cites Walton v. State, 147 Miss. 17, 112 So. 601, 602, where this Court said: "A trial should be confined to the merits of the issue involved, and not to prejudicial, extraneous, and inflammatory matter aliunde the record." The district attorney, in Sanderford et al. v. State, 178 Miss. 705, 174 So. 814, stated in his closing argument that two of the joint defendants were not on trial, but had joined the "bird gang" and gone to parts unknown. It was held that such statement of the district attorney of facts, not proved in the trial of appellant, was highly prejudicial to their rights and the case was reversed and remanded. See also Hill v. State, 196 Miss. 503, 16 So. (2d) 626, 627, where it was said: "There was neither direct evidence nor evidence from which it could have been reasonably inferred that the appellant had 'violated the moral law in taking the wife of deceased and living with her in unlawful cohabitation.' We are of opinion that the argument was such as to be highly prejudicial to the rights of appellant." The judgment was reversed and cause remanded for new trial. 53 American Jurisprudence, Trial, Sec. 503, p. 406, announces: "It is

highly improper for counsel in argument to use, without justifying evidence, language implying or asserting that particular witnesses for his adversary had been suborned to commit perjury on the trial and reprehensible conduct of this kind often results in the granting of a new trial, or the reversal of the judgment secured."

With the record here teeming with revelatory evidence as to the hostile and threatening state of mind of his son-in-law against appellant, corroboratory and not merely cumulative, much of the most important excluded from consideration by the jury in the trial; and this accompanied by first admitting and then excluding the damaging implication as to appellant's motive in shooting deceased, because of appellant's insinuated misconduct with some woman; and also connected with the closing speech of the district attorney branding appellant's witnesses, as to what they were permitted to testify, as kinfolk and bootleggers—we think, all together entitle appellant to a reversal and a new trial, where such errors will not be repeated.

Therefore, the judgment of the trial court is reversed and the case remanded for a new trial.

Reversed and remanded.

**Sydney Smith, C. J.,** did not participate in this decision.

**McGehee, J.,** delivered a dissenting opinion.

The controlling issue of fact in this case is whether or not the deceased reached toward the bib of his overalls for a pistol imediately before he was shot by the accused.

The killing occurred when the deceased stopped his truck in the street in front of the defendants home to get his wife and children so as to take them home, and after his wife and children had already gotten in the truck to go home with him after their visit there during the day.

There is no issue raised in the evidence as to who was the aggressor in what transpired on that occasion. The defendant admitted that he armed himself with a pistol and placed it in his belt and was advancing toward the truck as he reminded the deceased that he had theretofore warned him not to stop at his house any more.

The trial court, however, permitted, and I think properly so, the evidence offered by the defendant and his witnesses as to all that occurred at the barber shop about two weeks before the killing, except a dispute between the deceased and a bystander regarding the disturbance there, and also admitted numerous other alleged threats of the deceased toward the defendant and sufficient to abundantly show the state of mind of the deceased at the time of the killing, if the jury believed the testimony in that regard to be true. But it was shown that the previous difficulties with the deceased, and the threats and expressions of ill will by him, all occurred within a nine-day perod during which he and his wife were separated and while she was remaining at the home of her father, the defendant, and approximately two weeks transpired thereafter prior to the homicide.

It is the defendant's theory that these difficulties arose, and that the threats and expressions of ill will on the part of the deceased were made when the deceased was accusing the defendant of being responsible for the fact that his wife was remaining away from him. This cause of trouble, however, had been removed and the deceased and his wife had been living together for approximately two weeks when the killing occurred, as aforesaid; and it therefore became immaterial as to why the wife of the deceased had returned to live with him.

I think that the trial court was in error in excluding some of the evidence offered by the defendant but that the action of the court in that behalf does not constitute reversible error. For instance, the court excluded the statement of a defense witness to the effect that the deceased had said "There wasn't anyway to settle this

trouble and there wasn't anything I could say to him to change his feeling.'' However, the court permitted this same witness to testify that he had told the deceased that ''You can't afford a killing,'' and that he said ''That's what it will take to stop it, and by God I am ready for it.'' Therefore, the exclusion of the milder statement of the witness to the effect that ''There wasn't anything I could say to him to change his feeling,'' should not constitute reversible error.

I agree that the court committed some of the other errors, not sufficient to justify a reversal of the case, pointed out in the controlling opinion, but I am unable to concede that it was error to exclude the testimony about the deceased having shot down near the feet of a negro boy at the former's home during a controversy between the deceased and his wife and her mother prior to the beginning of the trouble between the deceased and the defendant.

And I concur in the opinion to the effect that the district attorney should not have inquired about an alleged affair between the defendant and another woman, and that he should not have made comments to the jury complained of in his closing argument. However, the court sustained the defendant's objection in both instances and instructed the jury to wholly disregard these matters. I think that, therefore, under all the facts in the case it was not error to refuse the entry of a mistrial on account thereof.

**Alexander, J.**, joins in this dissent.